# 17-2908-cv

## United States Court of Appeals

*for the*

## Second Circuit

MARIE LAVENTURE, each individually and on behalf of the Estate of
CHERYLUSSE LAVENTURE, and the Estate of MARIE THERESE
FLEURICIANE DELINAIS, and the additional persons and their representatives
listed on Exhibit 1, and on behalf of all others similarly situated, MAGGIE
LAVENTURE, each individually and on behalf of the Estate of CHERYLUSSE
LAVENTURE, and the Estate of MARIE THERESE FLEURICIANE
DELINAIS, and the additional persons and their representatives listed on Exhibit
1, and on behalf of all others similarly situated, SANE LAVENTURE,

———————————————

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFFS-APPELLANTS

PAUL M. TARR
LESTER SCHWAB KATZ & DWYER, LLP
100 Wall Street, 27th Floor
New York, New York 10005
(212) 964-6611
ptarr@lskdnylaw.com

JAMES F. HAGGERTY
LAW OFFICE OF JAMES F. HAGGERTY
45 Broadway, Suite 3140
New York, New York 10006
(212) 480-0700
jamesfhaggerty@gmail.com

MARK A. GOTTLIEB
NORTHEASTERN UNIVERSITY
 SCHOOL OF LAW
360 Huntington Avenue
Boston, Massachusetts 02115
(617) 373-2026
mark@phaionline.org

*Attorneys for Plaintiffs-Appellants*

each individually and on behalf of the Estate of CHERYLUSSE LAVENTURE, and the Estate of MARIE THERESE FLEURICIANE DELINAIS, and the additional persons and their representatives listed on Exhibit 1, and on behalf of all others similarly situated, CARMEN LAVENTURE, each individually and on behalf of the Estate of CHERYLUSSE LAVENTURE, and the Estate of MARIE THERESE FLEURICIANE DELINAIS, and the additional persons and their representatives listed on Exhibit 1, and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

UNITED NATIONS, UNITED NATIONS STABILIZATION MISSION IN HAITI, BAN KI-MOON, Secretary-General of the United Nations, EDMOND MULET, former Under Secretary-General for the United Nations Stabilization Mission in Haiti, CHANDRA SRIVASTAVA, former Chief Engineer for the United Nations Mission to Haiti, PAUL AGHADJANIAN, Chief of Mission Support for the United Nations Mission to Haiti, PEDRO MEDRANO, Assistant United Nations Secretary General, MIGUEL DE SERPA, Under Secretary for Legal Affairs,

*Defendants-Appellees.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ................................................... 6

STATEMENT OF ISSUES ............................................................... 7

STATEMENT OF THE CASE........................................................... 8

FACTS ............................................................................................... 8

PROCEDURAL HISTORY.............................................................. 11

SUMMARY OF ARGUMENT ....................................................... 13

STANDARD OF REVIEW ............................................................. 16

ARGUMENT .................................................................................... 17

    I.     In Finding A Lack Of Subject-Matter Jurisdiction, The District Court Improperly Relied On This Court's Decisions In *Georges* And *Brzak* ............................................................................. 17

    II.    The UN's Assumption Of Liability For Damages Caused By Its Peacekeeping Forces Was A Clear And Unambiguous Agreement That The UN Would Submit To Enforcement Of Its Obligations, Which Expressly Waived Immunity.................................. 19

        a.    The Definition of Liability Includes An Agreement To Be Bound By Duties Or Obligations Enforceable In Law............................................................................................. 20

        b.    This Court Has Held, And The UN Has Agreed, That "Liability" And "Immunity" Are Mutually Exclusive ............ 21

        c.    The UN Defines Liability Consistent With U.S. Law .............. 23

        d.    Assumption Of Liability Is A Common Manner Of Waiving Immunity, Subject To The Constraints Of The Waiver Itself............................................................................. 25

    III.   The UN Secretary-General's Express Acceptance Of Liability In Reports 51/389 And 51/903 Constituted An Express Waiver Of Immunity ....................................................................... 32

      a. The term "liability" cannot refer to the UN's internal claims processes, since these are non-binding and voluntary ..................................................................34

      b. Reports 51/389 and 51/903 do not limit the UN's assumption of liability to its voluntary internal claims processes, or state that the UN has retained immunity .............36

IV. The District Court Erred In Finding The UN Cannot Expressly Waive Immunity In Advance, But Instead Only Separately After A Claim Has Been Filed ..........................................................43

      a. The District Court improperly made, rather than construed, treaty law by inferring that CPIUN § 2 prohibits the UN from expressly waiving immunity in advance.................................................................43

      b. International legal authority recognizes that CPIUN § 2 allows for advance waiver ........................................45

      c. The clear meaning of the words "any particular case" include a group or class of cases .............................47

      d. To read the phrase "any particular case" in any other way would lead to absurd results ...............................47

V. The District Court Erred In Finding The Individual Defendants Are Entitled To Immunity Because The UN Itself Is Not So Entitled.................................................................................50

VI. The Mistaken Opinion Of The Executive Branch Is Not Entitled To The Deference That Federal Courts Normally Afford Such Opinions.................................................................................52

VII. The District Court Improperly Dismissed This Case Without Allowing Plaintiffs Limited Discovery Relevant To Subject-Matter Jurisdiction..................................................................54

CONCLUSION .......................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott v. Abbott*,
  560 U.S. 1 (2010).............................................................44

*Aquamar S.A. v. Del Monte Fresh Produce N.A.*,
  179 F.3d 1279 (11th Cir. 1999) .................................45

*Blanco v. United States*,
  775 F.2d 53 (2d Cir. 1985) ........................................19

*Blanks v. Seyfarth Shaw*,
  171 Cal. App. 4th 336 (Cal. App., Cal. 2d, Div. 3, 2009)............21

*Breslaw v. Rightmire*,
  119 Misc. 833 (N.Y. Cnty. Ct., Kings Co. 1922)........................21

*Brown v. State of New York*,
  89 N.Y.2d 172 (1996)...................................................31

*Brzak v. United Nations*,
  597 F.3d 107 (2d Cir. 2010) ...............................................*passim*

*CCF, Inc. v. First Nat'l Bank and Trust Co.*,
  69 F.3d 468 (10th Cir. 1995) ......................................21

*Chan v. Korean Air Lines, Ltd.*,
  490 U.S. 122 (1989)....................................................44

*Chew Heong v. United States*,
  112 U.S. 536 (1884)....................................................34

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)....................................................34

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*,
  347 F.3d 448 (2d Cir. 2003) ..........................................44

*Dairy Mart Convenience Stores, Inc. v. Nickel*,
  411 F.3d 367 (2d Cir. 2005) ........................................55

*De La Rama S.S. Co. v. United States*,
  344 U.S. 386 (1953)....................................................19

*Dennick v. Railroad Co.*,
    103 U.S. 11 (1881)............................................................1, 20, 28

*Ehrlich v. Am. Airlines, Inc.*,
    360 F.3d 366 (2d Cir. 2004) ..........................................53

*FAA v. Cooper*,
    566 U.S. 284 (2012).......................................................3, 26

*Federal Deposit Insurance Corporation v. Meyer*,
    510 U.S. 471 (1994)........................................................26

*Federal Housing Administration v. Burr*,
    309 U.S. 242 (1940)........................................................21

*Fire Asso. of Philadelphia v. Allis Chalmers Mfg. Co.*,
    129 F. Supp. 335 (N.D. Iowa, 1955) .............................21

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
    150 F.3d 172 (2d Cir. 1998) ..........................................55

*Foremost-McKesson, Inc.*,
    905 F.2d 438 (D.C. Cir. 1990)........................................54

*Fusz v. Spaunhorst*,
    67 Mo. 256 (S. Ct. Missouri, 1878)...............................48

*Georges v. United Nations*,
    834 F.3d 88 (2d Cir. 2016) ....................................*passim*

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982)........................................................49

*Guevara v. Peru*,
    468 F.3d 1289 (11th Cir. 2006), *rev'd on other grounds*,
    608 F.3d 1297 (11th Cir. 2010) .....................................52

*Haggar Co. v. Helvering*,
    308 U.S. 389 (1940)........................................................49

*Harris v. Rivera*,
    921 F. Supp. 1058 (S.D.N.Y. 1995) ..............................20

*In re United States Catholic Conference*,
    824 F.2d 156 (2d Cir. 1987) ..........................................55

iv

*Irwin v. Department of Veterans Affairs*,
  498 U.S. 89 (1990)........................................................................26

*Jacobs v. Vrobel*,
  724 F.3d 217 (D.C. Cir. 2013)....................................................55

*King v. Burwell*,
  __U.S.__, 135 S. Ct. 2480 (2015) ...............................................42

*Kiobel v. Royal Dutch Petroleum Co. (Kiobel I)*,
  621 F.3d 111 (2d Cir. 2010) .................................................. 18-19

*Kirsch v. Barnes*,
  263 F.2d 692 (9th Cir. 1959) ......................................................21

*Krenger v. Pennsylvania R. Co.*,
  174 F.2d 556 (1949) ..............................................................21, 32

*Lozano v. Alvarez*,
  697 F.3d 41 (2d Cir. 2012) .........................................................53

*Mantena v. Johnson*,
  809 F.3d 721 (2d Cir. 2015) .......................................................16

*McElfresh v. Kirkendall*,
  36 Iowa 224 (1873)....................................................................21

*Medellin v. Texas*,
  552 U.S. 491 (2008)...................................................................52

*Molzof v. United States*,
  502 U.S. 301 (1992)...................................................................35

*Morissette v. United States*,
  342 U.S. 246 (1952)...................................................................35

*Palmer v. Massachusetts*,
  308 U.S. 79 (1939)....................................................................42

*Peninsula Asset Mgmt. (Cayman), Ltd. v. Hankook Tire Co.*,
  476 F.3d 140 (2d Cir. 2007) .......................................................16

*Pennsylvania v. Union Gas Co.*,
  491 U.S. 1 (1989).............................................................29, 30, 35

*People v. McRoberts*,
  62 Ill. 38 (S. Ct. Illinois, 1871)..................................................48

*Polak v. Int'l Monetary Fund*,
657 F. Supp. 2d 116 (D.D.C. 2009)..............................................................55

*Pub. Citizen v. United States Dept. of Justice*,
491 U.S. 440 (1989)........................................................................................50

*Rasmus v. A. O. Smith Corp.*,
158 F. Supp. 70 (N.D. Iowa, 1958) ..............................................................21

*Rayonier v. United States*,
352 U.S. 315 (1957).........................................................................................27

*Red Ash Coal Corp. v. Absher*,
153 Va. 332, 149 S.E. 541 (1929) ................................................................34

*Richlin Security Service Co. v. Chertoff*,
553 U.S. 571 (2008)................................................................................. 26-27

*Sanders v. Szubin*,
828 F. Supp. 2d 542 (E.D.N.Y. 2011) .........................................................52

*Sebelius v. Cloer*,
569 U.S. 369 (2013).........................................................................................48

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996)...........................................................................................29

*Shamsee v. Shamsee*,
74 A.D.2d 357 (2d Dep't 1980).....................................................................52

*Sipple v. State*,
96 N.Y. 284 (1885)..........................................................................................31

*U.S. v. Bahel,*
662 F.3d 610 (2d Cir. 2011) ..........................................................................44

*United States v. Alvarez-Machain*,
504 U.S. 655 (1992).........................................................................................44

*United States v. American Trucking Assns., Inc*.,
310 U.S. 534 (1940).........................................................................................49

*United States v. Brown*,
333 U.S. 18 (1948)...........................................................................................50

*United States v. Chalmers*,
    No. S5 05 CR 59(DC), 2007 U.S. Dist. LEXIS 13232, 2007 WL
    624063 (S.D.N.Y. Feb. 26, 2007)..................................................................29

*United States v. Cty. of Arlington*,
    669 F.2d 925 (4th Cir. 1982) .......................................................................51

*United States v. King*,
    395 U.S. 1 (1969).........................................................................................26

*United States v. Kirby*,
    74 U.S. 482 (1868).......................................................................................48

*United States v. Mitchell*,
    463 U.S. 206 (1983).....................................................................................26

*United States v. Olson*,
    546 U.S. 43 (2005).......................................................................................28

*United States v. Ron Pair Enterprises Inc.*,
    489 U.S. 235 (1982).....................................................................................49

*United States v. Gonzales*,
    520 U.S. 1 (1997).........................................................................................47

*Univ. of W. Va. Bd. of Trs. ex rel. W. Va. Univ. v. Graf*,
    205 W. Va. 118 (1998) ................................................................................31

*Vogel v. Trans World Airlines*,
    346 F. Supp. 805 (E.D. Mo. 1970) ..............................................................21

*Yu v. Paperchase Partnership*,
    114 N.M. 635 (N.M. 1992)..........................................................................22

**Federal Statutes:**

22 U.S.C. § 6288 ....................................................................................................30

28 U.S.C. § 1291 ......................................................................................................6

28 U.S.C. § 1330 ....................................................................................................30

28 U.S.C. § 1332(d)(2)(B) .......................................................................................6

28 U.S.C. § 1346(b) ..........................................................................................27, 28

28 U.S.C. § 1367 ......................................................................................................6

28 U.S.C. § 1602 ................................................................30

28 U.S.C. § 2674 ...........................................................27, 28

28 U.S.C. § 2680 ................................................................27

29 U.S.C. § 633a ................................................................28

33 U.S.C. § 1323 ................................................................29

42 U.S.C. § 2000e-16 .........................................................28

42 U.S.C. § 7418 ................................................................29

42 U.S.C. § 9620(a)(1) .......................................................29

**State Statutes:**

12 V.S.A. § 5601 ................................................................31

14 M.R.S. § 8104-A (1) ......................................................31

42 Pa.C.S. § 8522(b) ..........................................................31

51 Okl. St. § 153 ................................................................31

Alaska Stat. § 09.50.250 .....................................................32

ALM GL ch. 258, § 2 ..........................................................31

Cal. Gov't Code, § 815 .......................................................30

Colorado: C.R.S. § 24-10-108 ............................................32

Fla. Stat. § 768.28 ..............................................................31

Idaho Code § 6-903(1) ........................................................31

K.S.A. §75-6103 ................................................................31

Maryland: Md. Code. Ann., State Gov't §12-101 ...............32

Minn. Stat. § 3.736 ............................................................31

Montana, 2-9-102 ...............................................................31

N.C. Gen. Stat. § 115C-42 .................................................47

N.D. Cent. Code, § 32-12.2-02 ..........................................31

N.J. Stat. § 59:2-2(a) .........................................................31

R.I. Gen. Laws § 9-31-1 ........................................................................31

R.R.S. Neb. § 81-8,215 ..........................................................................31

Rev. Code Wash. (ARCW) § 4.92.090 ..................................................31

S.C. Code Ann. § 15-78-40 ....................................................................31

Va. Code Ann. § 8.01-195.3 ..................................................................31

W. Va. Code § 29-12A-4 .......................................................................31


**Other Authorities:**

2 *Bouvier L. Dict.* 1950 ........................................................................21

74 Am. Jur. 2d, §50 (2012) ...................................................................21

*Black's Law Dictionary* (10th ed. 2014)..........................................21, 22

C. Wickremasinghe, "International Organizations or Institutions, Immunities before National Courts," in *Max Planck Encyclopedia of Public International Law* .................................................................46

Corbin, Arthur, "Legal Analysis and Terminology," 29 Yale L. J. 163 (1919)................................................................................................22

CPIUN § 2...................................................................................*passim*

Gregory Sisk, *Litigation with the Federal Government* (West Academic Publishing, 2016)................................................................................28

Hohfeld, Wesley N., "Fundamental Legal Conceptions as Applied in Judicial Reasoning" (1917) ...............................................................22

*Immunity of International Organizations* (Brill | Nijoff, 2015), Chapter 3: *Immunity Under Customary International Law?* ..........................18

Linda S. Frey & Marsha L. Frey, *The History of Diplomatic Immunity*, 540 (Ohio State University Press, 1999) .........................................51

M. Möldner, "International Organizations or Institutions, Privileges and Immunities," in *Max Planck Encyclopedia of Public International Law* (2011).........................................................................................46

Reinisch, August, *The Conventions on the Privileges and Immunities of the United Nations and its Specialized Agencies: A Commentary* (Oxford Commentaries on International Law), IV(A) ...................................45

Restatement (Second) of Torts § 895D (2015).................................................. 51-52

Restatement (Third) of the Foreign Relations Law of the U.S., § 326...................52

Restatement (Third) of the Foreign Relations Law of the United States § 456(2)(b)(ii) (1987) ...................................................................47

*Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16 (1913) ...................................................................22

*The American Heritage Dictionary, 5th Edition,* Dell Mass Market Edition (Houghton, Mifflin, Harcourt Publishing Company, 2012).........................47

U.N. Charter art. 105, § 1...................................................................2

*Vienna Convention on Diplomatic Relations* pmbl., Apr. 18, 1961, 23 U.S.T. 3227, 3230, 500 U.N.T.S. 95 .........................................................51

*Webster's Third New International Dictionary of the English Language,* unabridged (Merriam-Webster, Incorporated, 1993) ....................................47

Reinisch, August, *The Conventions on the Privileges and Immunities of the United Nations and its Specialized Agencies: A Commentary* (Oxford Commentaries on International Law), IV(A) ...................................45

Restatement (Second) of Torts § 895D (2015)................................... 51-52

Restatement (Third) of the Foreign Relations Law of the U.S., § 326....................52

Restatement (Third) of the Foreign Relations Law of the United States § 456(2)(b)(ii) (1987) ...................................................................47

*Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16 (1913) ...................................................................22

*The American Heritage Dictionary, 5th Edition,* Dell Mass Market Edition (Houghton, Mifflin, Harcourt Publishing Company, 2012)........................47

U.N. Charter art. 105, § 1...............................................................2

*Vienna Convention on Diplomatic Relations* pmbl., Apr. 18, 1961, 23 U.S.T. 3227, 3230, 500 U.N.T.S. 95 .............................................51

*Webster's Third New International Dictionary of the English Language,* unabridged (Merriam-Webster, Incorporated, 1993) ....................................47

# INTRODUCTION[1]

*". . . damage caused in breach of an international obligation and which is attributable to the State (or to the Organization), entails the international responsibility of the State (or of the Organization) and its liability in compensation."*

> -- Statement of the Secretary-General of the United Nations in Report A/51/389[2]

At the heart of this case is a simple proposition: that words have meaning. The United Nations cannot agree to be liable but restrict their liability to a forum that is non-binding or doesn't exist at all. It renders the term "liability" meaningless. It is like agreeing to a debt, but only in fictitious currency—it is impossible under the very definition of the term. Moreover, if a party expressly assumes liability without limiting this liability to a specific, *binding* forum, that party has expressly waived immunity from legal process in any competent U.S. jurisdiction, since the Supreme Court has long held that "wherever, by either the common law or the statute law . . . a right of action has become fixed and a legal liability incurred, that liability may be enforced and the right of action pursued in any court which has jurisdiction of such matters . . . ." [3]

---

[1] The Defendants in this case include the United Nations itself, the United Nations Stabilization Mission in Haiti (MINUSTAH), and several current and former United Nations officials, including the former Secretary-General. Throughout this brief, said Defendants are collectively referred to as the "United Nations," the "UN" or the "Organization."

[2] Adopted in full by the General Assembly in Resolution A/52/247.

[3] *Dennick v. Railroad Co.,* 103 U.S. 11, 18 (1881).

The specific question before this Court is whether the United Nations, by unambiguously assuming liability for damages caused by UN peacekeeping forces in certain circumstances, expressly waived immunity from legal process before U.S. courts in those cases.[4]

The answer is that the UN *has* expressly waived immunity, because no other explanation makes plausible sense. No other answer is consistent with the plain language of the CPIUN and the statements of the Secretary-General in Reports A/51/389 and A/51/903, which were then adopted by the full General Assembly in UN Resolution A/52/247.[5] In expressly assuming liability, the UN could not have been referring to its internal claims settlement processes—which are clearly voluntary and non-binding—because inherent in the use of the term "liability" is *an agreement to be bound by a duty or obligation that can be enforced in law and justice*. This is the law of the United States, it is the common law definition of

---

[4] UN immunity derives from Article II, § 2 of the *Convention of Privileges and Immunities of the United Nations* ("CPIUN"), 21 U.S.T. 1418, (A-342), which specifies that the UN "shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity." The CPIUN's authority, in turn, flows from the Charter of the United Nations, which provides that the UN "shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes." U.N. Charter art. 105, § 1. http://legal.un.org/repertory/art104_105.shtml. (last accessed Dec. 28, 2017)
[5] Hereinafter referred to as "51/389," "51/903," and "52/247." *See* A-368 *to* A-407.

liability, and it is present in the specific pronouncements of the United Nations itself.[6]

And while there is a distinction between "jurisdictional immunity" and "immunity from liability," examples abound of entities with absolute immunity from legal process expressly waiving that immunity through the clear and unambiguous assumption of liability. It is quite common, in fact, under both U.S. federal and state law. Moreover, the Supreme Court has held that an immune entity need not utter "magic words" to expressly waive its immunity; it need only make an "unmistakable expression of intent" – as here.[7] Simply put: A party with jurisdictional immunity, who subsequently assumes liability, waives that jurisdictional immunity, subject to any *binding* limitations present in the waiver.

The United Nation's refusal to even consider the claims of its victims despite its assumption of liability serves as a stark reminder of what is at stake. The UN introduced a cholera epidemic into Haiti in 2010 that, to date, has killed more than 10,000 people and sickened more than 1 million. This Court's decision will determine whether these victims and their survivors will *ever* see a measure of justice, in a case where causation is undisputed, responsibility clear, and liability

---

[6] To be perfectly clear at the outset, Plaintiffs are <u>not</u> arguing that an inadequate claims process is the express waiver, as was argued in *Brzak, infra*. Rather, the fact that the UN's claims processes were non-binding simply shows that, *contra* to the District Court's holding, the Secretary-General could not have been referring to these non-binding claims procedures when using the word "liability."

[7] *FAA v Cooper*, 566 U.S. 284, 291 (2012)

expressly assumed through the UN's formal statements and enactments.

Few of the facts are in dispute. Haiti hadn't seen a case of cholera in more than 100 years. Following a 2010 earthquake, the United Nations sent peacekeepers to Haiti from Nepal, a country rife with cholera. The UN placed these Nepalese peacekeepers in Haiti without bothering to test them for the disease. The UN then constructed sanitation facilities with cracked and leaking pipes and open containment pits, which caused cholera to spread throughout the country in a matter of weeks. According to the UN's own experts, the UN piled cholera-infected raw feces in uncovered pits along a tributary of the Artibonite River, despite common knowledge that the river was widely used for drinking water, bathing and farming.[8] It would be hard to find a tortious act so egregious and devastating as this—nor an act that so cries out for legal redress. Yet the UN has refused to even consider the claims of the victims of this plague. The claims were turned away as "not receivable."

The District Court ignored all this in deciding it lacked subject-matter jurisdiction over the UN. The court held that any acceptance of liability in the reports of the Secretary-General was only in the context of the UN's non-binding internal claims processes, and that the UN could not have expressly waived

---

[8] *See* "Lessons from Cholera in Haiti," International Bar Association: http://www.ijdh.org/wp-content/uploads/2017/09/Human-Rights-Law-September-2017.pdf (last accessed Dec. 28, 2017).

immunity in advance for a particular group or class of claims, since such waiver can only be made on an individual basis, for each single case, following the commencement of an action. These holdings are entirely in error. This Court should reverse.

In so holding, the District Court improperly relied on this Court's decision in *Georges v. United Nations,*[9] which involved the same underlying events but never even considered the issue of waiver of immunity, and *Brzak v. United Nations,*[10] an earlier employment law case that dealt with the adequacy of a *binding* internal employment dispute procedure. This case presents issues that are wholly distinct from those considered by this Court in those decisions, and neither precedent should, or need be, disturbed.

Indeed, the opposite is true: to affirm the District Court's decision, this Court would have to (1) change the meaning of the word "liability" as it has been understood under U.S. law, in the common law, and in the specific pronouncements of the United Nations for more than a century; (2) disregard this Court's own long-standing precedent holding that liability and immunity are mutually exclusive jural opposites; (3) decide that the phrase "any particular case," contained in CPIUN § 2, relates only to each individual claim after it has been filed—in effect adding words to the treaty in violation of clear precedent; and (4)

---

[9] *Georges v. United Nations*, 834 F.3d 88 (2d Cir. 2016).
[10] *Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010).

interpret facts in a highly implausible manner, despite both impossibility as a matter of law *and* the absurdity of the results, and without allowing a fair opportunity to determine the facts through limited discovery.

Words have meaning, even when used by the United Nations. By unambiguously agreeing to accept liability for the tortious acts of its peacekeeping forces, the UN expressly waived its immunity. To rule otherwise is to render the term "liability" meaningless. This Court should find the UN subject to the jurisdiction of the District Court for the damages wrought upon the people of Haiti.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2)(B), which grants jurisdiction over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State," and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. In an Order entered on August 23, 2017, the District Court directed the case to be dismissed, and denied as moot Plaintiffs' motion to file a sur-reply, as well as Plaintiffs' request for limited discovery of the UN on the subject of immunity. SA-12. Judgment was entered on August 24, 2017. SA-12. On September 18, 2017,

Plaintiffs filed a timely Notice of Appeal. A-480-482.

## STATEMENT OF ISSUES

1. To assume liability is to agree to be bound in law and justice to an enforceable obligation. The UN assumed liability through reports of the Secretary-General that were then adopted in full by the General Assembly. Should the UN be bound by the plain meaning of the words to which it expressly agreed?

2. Assumption of liability is a common mechanism a party with absolute immunity uses to waive immunity from legal process. Did the District Court err in ruling that the UN's assumption of liability was not an express waiver of immunity under § 2 of the CPIUN, but instead related only to a non-binding internal claims process?

3. It is established law that to add words to a treaty makes, rather than construes, the treaty. Nowhere in CPIUN § 2 does it say that express waiver must be made in individual cases after they are filed. Did the District Court err is so holding?

4. Did the District Court err in refusing Plaintiffs' the opportunity for limited discovery where specific facts are needed to determine subject matter jurisdiction?

## STATEMENT OF THE CASE

## FACTS

In 2004, the UN executed a "Status Of Forces Agreement (SOFA)" with the Haitian government that included provisions requiring the establishment of an internal standing claims commission for the settlement of third-party claims. A-21. Such a commission, however, was never set up in Haiti, *Id.* Indeed, it has never been established in the history of the UN. A-383.

Haiti had no reported cases of cholera until October 2010, when the UN deployed 1,075 Nepalese troops to that earthquake-stricken nation. Despite widespread knowledge of cholera's prevalence in Nepal, Defendants did not test or treat the peacekeepers for the disease before deploying them. A-209.

The UN disposed of the Nepalese peacekeepers' waste at a MINUSTAH base in the village of Meille, along the banks of a tributary of the Artibonite, Haiti's longest river. A-181. The sanitation system was never properly constructed. A-161. Although the pits regularly overflowed in the rain, Defendant made no attempt to prevent contamination. A-183.

The consequences were immediate and devastating. By mid-October 2010, cholera-infected human waste flowed into waterways that tens of thousands of Haitians relied on for drinking, bathing, and farming. A-161. Within weeks, the disease swept through the country, its victims suffering excruciating diarrhea and

8

vomiting. The pain was so severe that some died within hours. A-184. The epidemic is estimated to have killed more than 10,000 people, and sickened more than 1 million. A-320. Moreover, the epidemic is ongoing, killing approximately 1,000 Haitians each year. A-158.

It is undisputed that the cholera originated from the UN base. A-199. Journalists who visited the base shortly after the outbreak documented the poorly constructed sanitary systems and the unbearable smell of feces. A-199. The cholera strain was tested and matched that present in the Nepalese outbreak. A-162. Despite all this, the UN ignored external reports for months. Finally, in January 2011, the UN Secretary-General appointed a panel of experts to investigate the source. A-161. Those experts concluded "personnel associated with the [UN] facility were the most likely source of introduction of cholera into Haiti." A-199.

Defendants continued to deny the UN's connection to the outbreak. MINUSTAH issued several false statements that all Nepalese soldiers deployed to Haiti in October 2010 had been tested for cholera and none had the disease. A-192. Defendants privately acknowledged these statements were untrue but never retracted them. *Id.*

The UN continued to deny responsibility until August 17, 2016, the day before this Court decided *Georges,* a factually related but legally distinguishable case. On that date, the UN finally admitted "its own involvement in this initial

outbreak."[11] And on December 1, 2016, before a meeting of the General Assembly, the Secretary-General stated on behalf of the UN that they were "profoundly sorry for [its] role" in the epidemic, and that the Defendants have a "moral responsibility" to make things right. A-45.

**Defendants' Failure to Provide Access to Extrajudicial Remedies**

On November 3, 2011, approximately 5,000 victims of cholera filed administrative claims with the UN for compensation and remediation, pursuant to Section 29 of the CPIUN. A-216. These victims also sought the establishment of a claims commission to hear their claims. A-216. The UN did not respond for fifteen months, and then simply turned away the claimants without initiating an internal claims review process. The UN stated, without further explanation, that the claims were "not receivable." A-217.

**The UN's Empty Promises To Compensate the Haitian People**

Since this Court decided *Georges*, UN officials have addressed the cholera crisis mainly with broken promises. The UN created voluntary trust funds that lie near empty.[12] Although at first the UN vowed to compensate victims directly,[13] it

---

[11] See https://www.nytimes.com/2016/08/18/world/americas/united-nations-haiti-cholera.html. (last accessed Dec. 28, 2017).

[12] https://learningenglish.voanews.com/a/un-fund-to-fight-cholera-in-haiti-at-2-percent-of-goal/3748386.html. (last accessed Dec. 28, 2017).

[13] https://www.nytimes.com/2016/10/25/world/americas/haiti-united-nations-cholera.html?_r=0. (last accessed Dec. 28, 2017).

then suggested that any funds disbursed would only be for "community projects."[14] Because the UN believes it cannot be bound to its express agreement to assume liability, it continues to evade its obligations without fear of legal consequence.

## PROCEDURAL HISTORY

This case was filed in the District Court on March 11, 2014. A-1. Plaintiffs' process servers were turned away at the United Nations, and "nail and mail" service was unavailable (A-24), but the Government stated the UN received process via facsimile machine. A-142. On June 20, 2014, Defendant Ban, the former Secretary-General, was served personally on the streets of Manhattan. Plaintiffs filed proof of service within the 120 days. A-47. An Amended Complaint was filed on October 14, 2014. A-48.

On March 24, 2015, the District Court ordered the proceedings stayed pending resolution of the appeal in *Georges*. A-42. On August 18, 2016, this Court upheld the District Court's decision in that case. A-43. As the plaintiffs in *George* did not allege that the UN waived immunity, that case was decided on different grounds than are presented here. After initiating a petition for a writ of certiorari to the Supreme Court, the *Georges* plaintiffs abandoned that appeal in January 2017.

On March 23, 2017, the District Court issued an Order to Show Cause as to why this case should not be dismissed in light of *Georges.* A-41. On March 30,

---

[14] http://www.miamiherald.com/news/nation-world/world/americas/haiti/article163840063.html. (last accessed Dec. 28, 2017).

2017, Plaintiffs responded, requested permission to file a Second Amended Complaint, and moved for a default judgment against the UN. A-52-54. By order dated April 7, 2017, the District Court directed the UN to file its opposition Plaintiffs' motion by April 24, 2017, and invited U.S. Government (hereinafter referred to as "Government") to indicate its position by letter by that same date. A-163. The UN never responded. On May 24, 2017, the Government filed a Statement of Interest (SOI). A-137-144.

In response to the Government's SOI, on June 6, 2017, Plaintiffs' proposed a briefing schedule similar to that in *Georges*. A-150-152. The District Court denied this request on June 12, 2017, and instead allowed Plaintiffs to file a single brief and a Second Amended Complaint within 11 days. The District Court also permitted the UN or Government to reply to Plaintiffs' response. A-153-156.

On June 23, 2017, Plaintiffs timely filed its opposition to the Government's SOI and their Second Amended Complaint. A-157-122. The Government responded on July 7, 2017, and presented new facts regarding the UN's intent when it assumed liability. A-462-466. In response, on July 11, 2017, Plaintiffs requested an opportunity to file a sur-reply to address these new factual arguments, and to conduct limited discovery regarding the UN's intent in assuming liability. A-474. On July 18, 2017, the Government opposed both requests. A-477-479.

On August 23, 2017, the District Court dismissed this case for lack of subject matter jurisdiction, accepting the Government's presentation of relevant facts regarding the UN's intent when assuming liability, and otherwise drawing all inferences in the Defendants' favor. SA-1-11. A judgment was entered the following day. SA-12. The August 23, 2017 Order forms the basis for this appeal, notice of which was timely filed on September 18, 2017. A-480-482.

## SUMMARY OF ARGUMENT

The UN expressly waived its immunity through its unambiguous assumption of liability for damages caused by its peacekeeping forces. This waiver provides the District Court with subject matter jurisdiction. In dismissing this case for lack of jurisdiction, the District Court improperly relied on this Court's decisions in *Georges*, *supra*, in which there was no allegation of an express waiver, and *Brzak*, *supra*, which addressed *binding* internal UN review procedures, unlike those at issue here.

For the UN to waive its immunity under CPIUN § 2, there must be a clear and unambiguous manifestation of its intent to do so. But the Supreme Court has held that an express waiver by a body with immunity *need not* be made in any particular way, or through the invocation of "magic words." Further, an assumption of liability is a common mechanism for an entity with absolute immunity to expressly waive immunity from legal process.

13

Moreover, this Court has held that "liability" and "immunity" are mutually exclusive jural opposites. Thus, for the UN to re-assume its liability negates immunity, subject to any limitations in the waiver itself.

By this standard, when the UN Secretary-General agreed that the UN would assume liability for damages caused by its peacekeeping forces, he could not have been referring to the UN's own non-binding internal claims process. This is because the acceptance of "liability" is by definition an agreement to be bound by a legally enforceable obligation—under both U.S. law and the UN's own pronouncements. The UN's non-binding internal claims processes cannot meet this standard: the "standing commissions" referenced in Reports 51/389 and 51/903 were never implemented, and the claims of 5,000 victims presented to the UN were dismissed without consideration as "not receivable." The only plausible conclusion is that, through its assumption of liability, the UN expressly waived immunity to suit in any competent jurisdiction.

The District Court also erred in suggesting that the phrase "any particular case" in CPIUN § 2 means that the UN can only waive immunity in an individual case after a claim has been filed. CPIUN § 2 does not state that. Adding language, as the District Court did here, is to make rather than construe, a treaty. Further, waiver in advance for a group or class of claims is routine in other areas of immunity law. And any ambiguity in the phrase should be resolved in favor of a

14

reading that does not lead to an absurd result—as the District Court's ruling certainly would.

Additionally, the individual defendants are immune only if the UN itself is immune, which it is not. And the Government's unreasonable SOI is not entitled to the deference to which such official opinions are usually afforded.

Finally, if this Court believes there are unresolved issues of fact relevant to subject matter jurisdiction, this Court must reverse and remand for the conduct of limited discovery and an appropriate hearing before the District Court. Plaintiffs are entitled an opportunity to be fully heard, and a reasonable degree of evidentiary inquiry as to the UN's belief in its own pronouncements regarding liability and waiver.

## STANDARD OF REVIEW

Under long-standing principles, "[w]hen this Court reviews the dismissal of a complaint for lack of subject matter jurisdiction, we review factual findings for clear error and legal conclusions *de novo*, accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Georges,* at 92, citing *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015). This Court also reviews *de novo* legal determinations that grant or deny immunity. *Peninsula Asset Mgmt. (Cayman), Ltd. v. Hankook Tire Co.,* 476 F.3d 140, 141 (2d Cir. 2007).

# ARGUMENT

## I. IN FINDING A LACK OF SUBJECT-MATTER JURISDICTION, THE DISTRICT COURT IMPROPERLY RELIED ON THIS COURT'S DECISIONS IN *GEORGES* AND *BRZAK*

In dismissing the complaint on the grounds of lack of subject matter jurisdiction, the District Court improperly judged—or perhaps prejudged—this case based upon its misreading of this Court's decisions in *Georges* and *Bzrak*, *supra*. Before a single brief was submitted, both the District Court Judge, (A-155), and the Magistrate Judge, (A-136), expressed "serious doubts" regarding the viability of Plaintiffs' legal theories, reflecting an assessment that *Georges* and *Brzak* controlled. This assessment was in error.

In *Georges*, neither party alleged that the UN had expressly waived its immunity, as the District Court and this Court specifically noted. 834 F.3d at 91. The central issue in *Georges* was whether article 29 of the CPIUN, which requires that a standing claims commission be created for the settlement a third-party claims, was a condition precedent to the attachment of the immunity granted to the UN in CPIUN § 2. Plaintffs here raise no such argument. *Id.*

In *Brzak*, Plaintiffs challenged the UN's binding internal employment claims procedure, citing purported inadequacies as evidence of express waiver. This Court disagreed, holding that to find that such inadequacies to be an express waiver of immunity would be to "read the word 'expressly' out of the CPIUN." 597 F.3d at

112. Plaintiffs in *Brzak*, however, never alleged the UN expressly waived immunity in advance by assuming liability for damages caused by its peacekeeping forces. Conversely, Plaintiffs in this case are not alleging that it is the inadequacy or absence of an internal claims process in itself that is the express waiver of immunity. Rather, the lack of a *binding* claims process here simply means the Secretary-General could not have been limiting his assumption of liability to these internal processes. This is because, as explained in detail, *infra*, a party cannot agree to be liable without the ability to be *bound to a duty in law or justice*. That would render the term "liability" meaningless. *Brzak* does not address this issue.

Ultimately, based on the erroneous premises cited above, and perhaps because Plaintiffs had no opportunity to fully present their arguments in the same manner as other plaintiffs (*see* "Procedural History," *supra*), the District Court dismissed this action.

It should be noted as well that, beyond *Brzak* and *Georges*, the law surrounding the immunity of the United Nations itself is scant.[15] There is no customary international law on immunity; the law of the individual nations governs.[16] Similarly, "international law generally leaves all aspects of the issue of civil liability to individual nations." *Kiobel v. Royal Dutch Petroleum Co. (Kiobel*

---

[15] *See, generally*, *Immunity of International Organizations* (Brill | Nijoff, 2015), Chapter 3*: Immunity Under Customary International Law?,* at 39-40.
[16] *Id.*, at 40.

*I)*, 621 F.3d 111, at 152 (2d Cir. 2010) (Leval, J., concurring). Therefore it is fully within the province of this Court to decide this case based on clearly defined principles of U.S. law relating to the express waiver of immunity, the assumption of liability, and the right to seek limited discovery to determine whether immunity has been waived and subject matter jurisdiction exists.

## II. THE UN'S ASSUMPTION OF LIABILITY FOR DAMAGES CAUSED BY ITS PEACEKEEPING FORCES WAS A CLEAR AND UNAMBIGUOUS AGREEMENT THAT THE UN WOULD SUBMIT TO ENFORCEMENT OF ITS OBLIGATIONS, WHICH EXPRESSLY WAIVED IMMUNITY

On several occasions over the course of the past century, the U.S. Supreme Court has elegantly characterized a central flaw in the District Court's decision:

> . . . to acknowledge the liability but to deny the full extent of its enforceability recalls what was said in *The Western Maid*, 257 U.S. 419, 433 [1922]: "Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp."

*De La Rama S.S. Co. v. United States*, 344 U.S. 386, 390 (1953).[17]

Under the District Court's erroneous reasoning, the UN's legal obligations to Plaintiffs are mere elusive "ghosts." This is wrong. The UN repeatedly and unambiguously assumed liability for damages caused by its peacekeeping operations. The UN did so through the Secretary-General's reports that were then

---

[17] More recently, in discussing *The Western Maid*, this Court noted that the Supreme Court, through Justice Holmes, dismissed this "notion of 'legal obligations that exist but cannot be enforced'" *Blanco v. United States*, 775 F.2d 53, 59, footnote 6 (2d Cir. 1985).

19

formally adopted by the General Assembly in UN Resolution 52/247, and as such are binding on the Organization.[18] Assumption of liability is a common mechanism for expressly waiving immunity to legal process and submitting to the jurisdiction of a court, subject to the conditions of the waiver itself. These words accepting liability impose upon the UN an enforceable duty in a binding forum, and in the absence of any limitation to a *binding* jurisdiction, the UN's waiver subjects it to the authority of the District Court or any other court of competent jurisdiction.[19]

### a. The Definition of Liability Includes An Agreement To Be Bound By Duties Or Obligations Enforceable in Law

Liability imposes obligations. That is, liability is *not*, as the Government suggests in its SOI, merely a non-binding "general commitment" to compensate injured parties for their losses. A-465. Rather, under U.S. law, common law usage *and* the UN's specific pronouncements, liability imposes upon the responsible party a *legal obligation* to be bound by an enforceable duty.

Indeed, U.S., federal and state courts have repeatedly held that liability is "the state of being bound or obliged in law or justice."[20] As the Ninth Circuit

---

[18] See Point III, *infra.*

[19] See *Dennick, supra;* and *Harris v. Rivera*, 921 F. Supp. 1058, 1061 (S.D.N.Y. 1995) ("No rule of statutory construction allows the court to rewrite a statute to add limitations that are found neither in the plain language of the statute nor in any legislative history. A [party] may pursue a claim . . . . by bringing an action in any court that has jurisdiction to hear the claim.")

[20] *Rasmus v. A. O. Smith Corp.,* 158 F. Supp. 70 (N.D. Iowa, 1958); *CCF, Inc. v. First Nat'l Bank and Trust Co.*, 69 F.3d 468, 473 (10th Cir. 1995); *Vogel v. Trans*

stated, liability is "the condition of one who is subject to a charge or duty which may be judicially enforced." *Kirsch v. Barnes*, 263 F.2d 692 (9th Cir. 1959). Thus, "when the law grants an immunity . . . the defendant is absolved from liability." 74 Am. Jur. 2d, §50 (2012), at 702*, quoting Blanks v. Seyfarth Shaw*, 171 Cal. App. 4th 336, 378 (Cal. App., Cal. 2d, Div. 3, 2009). When liability is subsequently reassumed, such immunity is waived, "with due regard for the statutory exceptions to that policy." *Federal Housing Administration* v. *Burr*, 309 U.S. 242, 251 (1940).

### b. This Court Has Held, And The UN Has Agreed, That "Liability" And "Immunity" Are Mutually Exclusive

This Court has held that assumption of liability and immunity are mutually exclusive. In *Krenger v. Pennsylvania R. Co.,* this Court wrote that "*liability* is quite differentiated from a mere duty to pay damages and serves as . . . the opposite of *immunity* or exemption. 174 F.2d 556, 559 (1949)  (emphasis in original)." This principle is so well-settled that it appears in *Black's Law Dictionary* under the very definition of "Liability."[21]

In so holding, this Court adopted the reasoning of Yale Law School Professor Wesley N. Hohfeld. In a seminal article in the early 20th Century entitled

---

*World Airlines*, 346 F. Supp. 805 (E.D. Mo. 1970); *Fire Asso. of Philadelphia v. Allis Chalmers Mfg. Co.*, 129 F. Supp. 335 (N.D. Iowa, 1955); *Breslaw v. Rightmire*, 119 Misc. 833, 835 (N.Y. Cnty. Ct., Kings Co. 1922); *McElfresh v. Kirkendall*, 36 Iowa 224 (1873); 2 *Bouvier L. Dict.* 1950; *see also, Black's Law Dictionary* (10th ed. 2014), Liability.

[21] *Black's Law Dictionary* (10th ed. 2014), Liability.

*Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16 (1913), Hohfeld laid out the nature of and distinctions among various legal concepts, including liability and immunity. Hohfeld classified fundamental legal relations into categories of "jural opposites" and "jural correlatives."[22] "Liability" was classified as the jural opposite, or negation, of "immunity."[23] This means, in short, that one who assumes a liability can no longer have immunity. As another esteemed legal scholar, Arthur Corbin, also of Yale Law School put it: "No pair of opposites can exist together." [24]

This analysis has been adopted by not only this Court but also the UN itself. A report entitled "Jurisdictional Immunities Of States And Their Property," by the UN's Special Rapporteur, directly addressed Professor Hohfeld's theory of liability and the "jural relationship":

> "[P]ower" has been correlated to "liability"; and the opposite of "liability", which is "immunity", is correlative to "no-power" or "disability". Thus, in a theory of jural relationship, if "a State has immunity from the jurisdiction from another State", the same expression could be stated correlatively from the standpoint of the other State as: "Another State has 'no-power' to exercise its jurisdiction over a State".[25]

---

[22] See Hohfeld, Wesley N., "Fundamental Legal Conceptions as Applied in Judicial Reasoning" (1917).

[23] *Id.*

[24] Corbin, Arthur, "Legal Analysis and Terminology," 29 *Yale L. J.* 163 at 166 (1919) ("No pair of opposites can exist together."); *see also Yu v. Paperchase Partnership*, 114 N.M. 635 (N.M. 1992).

[25] A/CN.4/340 & Corr.1 and Add.1 & Corr.1, *Third report on jurisdictional immunities of States and their property, by Mr. Sompong Sucharitkul, Special*

Thus, the United Nations understands quite well the premise inherent in Hohfeld's jural relationship analysis: that an express assumption or acceptance of liability negates its opposite, immunity, and removes the "disability" or "no-power" to exercise jurisdiction in actions where such liability has been assumed.

### c.  The UN Defines Liability Consistent With US Law

In addition to embracing the theoretical underpinnings of this Court's conception of liability, the UN, in its official reports, has promulgated a definition of liability that is remarkably similar to that under U.S. law. This is undermines the Government's assertion—and the District Court's apparent agreement—that the UN Secretary-General and the General Assembly were invoking a voluntary, non-binding internal claims procedure when the UN and expressly accepted liability for the damages caused by its peacekeeping forces.

In a 1986 Report addressing "[i]nternational liability for injurious consequences arising out of acts not prohibited by international law," [26] Special

---

*Rapporteur*, Extract from the Yearbook of the International Law Commission: 1981, vol. II(1), at 132-133. Available at:
http://legal.un.org/docs/?path=../ilc/documentation/english/a_cn4_340.pdf&lang=E FS (last accessed Dec. 29, 2017).

[26] A/CN.4/402 and Corr.1, Corr.2 (S only) to 4, *Second report on international liability for injurious consequences arising out of acts not prohibited by international law, by Mr. Julio Barboza, Special Rapporteur,* Extract from the Yearbook of the International Law Commission: 1986, vol. II(1). Available at: http://legal.un.org/docs/?path=../ilc/documentation/english/a_cn4_402.pdf&lang=E FS (last accessed Dec. 29, 2017).

Rapporteur Julio Barboza set forth a clear definition of liability. This definition specifically differentiated liability from mere "responsibility" and confirmed that specific and enforceable legal obligations attach when the UN assumes liability. While "responsibility" refers "to the consequences of unlawful acts," liability refers "to *the very obligation imposed by the primary norm*" (emphasis added)."[27]

The UN report goes on to describe this understanding of the term liability by citing the work of "another writer versed in common law, L. F. E. Goldie, examining the differences between the English terms 'responsibility' and 'liability' . . . ."[28] The Special Rapporteur noted that while "responsibility is taken to indicate a duty . . . *liability connotes exposure to legal redress once responsibility and injury arising from a failure to fulfill that legal responsibility have been established* (emphasis added):[29]

> "failure to observe one's responsibilities, or . . . being responsible in a causal sense for harm, carry the legal consequences (i.e. both the sanctioning and compensatory function) of incurring liability".[30]

Without enforcement there can be no liability. Given the universal acceptance of this definition of liability, it is simply implausible that the Secretary-General did not understand that the submission to binding legal authority inherent

---

[27] *Id.*, at 145.

[28] *Id.*, at 146.

[29] *Id.* at 146

[30] *Id.*, *citing* "Responsibility and liability in the common law", in *Legal Aspects of Transfrontier Pollution* (Paris, OECD, 1977), p. 344.

in the UN's express assumption of liability. It is equally implausible that the General Assembly did not understand the logical consequence of its adoption of Resolution 52/247.

### d. Assumption Of Liability Is A Common Manner Of Waiving Immunity, Subject To The Constraints Of The Waiver Itself

When entities with absolute immunity undertake to expressly waive such immunity, they commonly do so by expressly assuming liability. Such waivers are not implicit or by implication; they are express. Put another way: if immunity is a blanket that shields a sovereign party from legal process, then to expressly assume liability casts off this jurisdictional immunity, subject to the limitations of the waiver itself. Both federal and various state governments have waived their sovereign immunity by their assumption of liability in a manner quite similar to the assumption of liability in 51/389 and 51/903.

A quote from New York's highest court deftly describes what happens when an immune entity subsequently assumes liability:

> In the assumption of liability and the creation of a remedy to enforce a liability, heretofore absent by reason of the sovereignty of the tort feasor, the sovereign has not generously dispensed charity . . . [i]t declares that no longer will the [entity] use the mantle of sovereignty to protect itself from such consequences as follow negligent acts . . . [i]t admits that in such negligence cases the sovereign . . . promises that in future it will voluntarily discharge its moral obligations in the same manner as the citizen is forced to perform a duty which courts and Legislatures have so long held, as to him, to be a legal liability. It transforms an unenforceable moral obligation into an actionable legal

right . . . ." *Jackson v State of New York*, 261 N.Y. 134, 138, 184 N.E. 735 (1933).

As to the U.S., "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Federal Deposit Insurance Corporation v. Meyer*, 510 U.S. 471, 475 (1994) (citation omitted). The sovereign's consent is central to waiver, as "[i]t is axiomatic that the United States may not be sued without its consent," the existence of which "is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). To be sure, just like the UN's waiver of immunity under CPIUN § 2, "[w]aivers of the Government's sovereign immunity, to be effective, must be "'unequivocally expressed.'" *Irwin* v. *Department of Veterans Affairs*, 498 U.S. 89, 95 (1990) (*quoting United States* v. *Mitchell*, 445 U.S. 535, 538 (1980), and *United States* v. *King*, 395 U.S. 1, 4 (1969)). But, the Supreme Court has also held that although there must be "an unmistakable statutory expression of congressional intent to waive the Government's immunity, Congress need not state its intent in any particular way. We have never required that Congress use magic words." *FAA v Cooper*, 566 U.S. 284, 291 (2012), *citing Richlin Security Service Co.* v. *Chertoff*, 553 U.S. 571, 589 (2008). To the contrary, the Supreme Court has held that "the sovereign immunity canon 'is a tool for interpreting the law' but that it does not 'displac[e] the other traditional tools of statutory construction.'" *Id*.

The example of the Federal Tort Claims Act (FTCA) illustrates this point

well, and is analogous to the waiver by the UN of its immunity under § 2 of the CPIUN. In the FTCA, the federal government expressly waived its immunity for certain tort claims of a private law nature through 28 U.S.C. § 2674. This statute provides: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." *Id.* In other words, as in the UN reports and resolutions at issue here, the U.S. government's acceptance of liability in the FTCA is an express waiver of immunity, subject to the exceptions and limitations contained elsewhere in the act.[31]

Other sections of the FTCA, most notably § 2680, provide exceptions to this waiver, and jurisdictional provisions are set forth in § 1346(b). Section 1346(b) also provides additional descriptions of possible claims. To be clear, however, these jurisdictional provisions are not where the waiver of immunity happens. As one scholar has pointed out: "Section 2674 states the substance of the waiver of sovereign immunity in the FTCA. Although Subsection 1346(b) is primarily a jurisdictional provision, conferring jurisdiction over FTCA actions in the United States District Courts, it also includes language describing permissible claims."[32]

---

[31] "[T]he very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish . . . governmental liability." *Rayonier v. United States*, 352 US 315, 319 (1957).

[32] Gregory Sisk, *Litigation with the Federal Government* (West Academic Publishing, 2016), page 134. *See also United States v Olson*, 546 US 43, 46 (2005)

In the absence of any jurisdictional provisions such as those contained in § 1346(b), the express waiver in § 2674 would still be express and still be valid—and would be applicable in any court of competent jurisdiction, since as discussed, *supra,* "wherever, by either the common law or the statute law . . . a right of action has become fixed and a legal liability incurred, that liability may be enforced and the right of action pursued in any court which has jurisdiction of such matters . . ." *Dennick v. Railroad Co.,* 103 U.S. 11, 18 (1881).

Other federal statutes convincingly demonstrate that express waiver of immunity can be made through the assumption of liability. Indeed, it is quite common. The U.S. government, for example, has waived its sovereign immunity under both the Employment Opportunity (EEO) Act and the Age Discrimination in Employment Act (ADEA) by accepting liability if government workplaces are not free of employment and age discrimination.[33]

Federal environmental statutes function in this manner as well. In the Clear Water Act, for example, 33 USCS § 1323, as well as the Clean Air Act, 42 USCS § 7418, there are express waivers of immunity in an agreement to be subject to liability under various state and federal laws. So too, with federal CERCLA statute, as set forth in 42 U. S. C. § 9620(a)(1), otherwise known as the Superfund law.

(28 U.S.C. § 2674 "makes the United States liable 'in the same manner and to the same extent as a private individual under *like circumstances.*'" (emphasis in original)).

[33] *See* 42 USCS § 2000e-16 and 29 USCS § 633a.

CERCLA provides: "Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title." As the U.S. Supreme Court has held,

> This is doubtless an "unequivoca[l] express[ion]" of the Federal Government's waiver of its own sovereign immunity, *United States* v. *Testan*, 424 U.S. 392, 399 (1976), *quoting United States* v. *King*, 395 U.S. 1, 4 (1969), *since we cannot imagine any other plausible explanation for this unqualified language*.

*Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 10 (1989) (emphasis added).[34]

Again, in each case, the assumption of liability is an "unequivocal expression"—or "a clear and unambiguous manifestation"[35]—of the intent to waive. Pursuant to the Supreme Court's reasoning in *Pennsylvania v. Union Gas*, *Id*., the U.S. Government was found to have expressly waived immunity where there was no other plausible explanation for what could be meant by a clear assumption of liability.[36]

---

[34] Overruled on other grounds, i.e., the waiver of 11th Amendment sovereign immunity by a State, in *Seminole Tribe v Florida*, 517 U.S. 44 (1996).

[35] As the District Court for the Southern District of New York found for an express CPIUN § 2 waiver. *See United States v. Chalmers*, No. S5 05 CR 59(DC), 2007 U.S. Dist. LEXIS 13232, 2007 WL 624063, at *2 (S.D.N.Y. Feb. 26, 2007).

[36] This is not to say that an assumption of liability is the only way to effectuate an express waiver of immunity. Both the Foreign Sovereign Immunities Act (FSIA),

Under the laws of various U.S. states as well, a waiver of immunity from legal process is also found in the express assumption of liability. In California, for example, under Cal. Gov't Code, § 815, a public entity is "not liable for injury" except as provided for elsewhere in the statute. In Section 815.2, for example, "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment . . . ." As with the FTCA, it is the acceptance or acknowledgement of the liability in California law that is the waiver of immunity, not any jurisdictional provision.

In New York, " . . . [w]hile pertinent decisions of many appellate courts (including the Court of Appeals) . . . have on occasion conflated references to the scope of the State's waiver of sovereign immunity with undefined usage of the term 'jurisdiction,'" *Brown v State of New York*, 89 N.Y.2d 172, 180 (1996), "the State can be made liable for injuries arising from the negligence of its agents or servants, only by force of some positive statute assuming such liability." *Sipple* v. *State*, 96 N.Y. 284, 287 (1885). And in West Virginia, while the immunity of the

---

28 U.S.C. §1330, 1602, *et. seq.* and the International Organizations Immunities Act (IOIA), 22 USC 6288, *et. seq.,* waive immunity by subjecting immune entities to the jurisdiction of U.S. courts. Despite their seeming applicability to this case, neither statute is particularly analogous: e.g., FSIA creates a restrictive immunity that may be waived by implication; and both *Georges* and *Brzak* have clearly decided that it is § 2 of the CPIUN, and not the IOIA, that governs United Nations' immunity (*see*, e.g., *Brzak* 512 F.3d, at 112-113.). Moreover, since the claims in question relate to an express waiver of damages in tort claims by UN peacekeepers under CPIUN § 2, federal and state acts waiving the absolute immunity in tort claims are most relevant to this Court's analysis.

sovereign described in the Constitution is from legal process (W. Va. Const. Art. VI, § 35: "The State of West Virginia shall never be made defendant in any court of law or equity . . . ."), express waivers of this immunity are often in the form of assumption of liability. *See e.g.,* W. Va. Code § 29-12A-4; *Univ. of W. Va. Bd. of Trs. ex rel. W. Va. Univ. v. Graf*, 205 W. Va. 118 (1998).

Plaintiffs have identified more than 20 additional U.S. states where absolute immunity is expressly waived by assumption of liability.[37] There is no separate waiver for the purposes of jurisdictional or legal process—the express agreement to be liable <u>is</u> the waiver. In accord with the reasoning of this Court in its adoption of the Hohfeldian analysis in *Krenger*, the assumption of liability negates immunity—including immunity from liability *and* immunity from legal process.

Again, this doesn't mean that sovereigns cannot, or do not, also waive immunity from legal process by stating an immune entity is now subject to the jurisdiction of the courts. Some do.[38] But it does mean that specific language

---

[37] In addition to the examples cited in this brief, *see also* Vermont, 12 V.S.A. § 5601; New Jersey, N.J. Stat. § 59:2-2(a); Idaho Code § 6-903(1); Kansas, K.S.A. §75-6103; Florida, Fla. Stat. § 768.28; Maine, 14 M.R.S. § 8104-A (1); Massachusetts, ALM GL ch. 258, § 2; Minnesota, Minn. Stat. § 3.736; Montana, 2-9-102, MCA; Nebraska, R.R.S. Neb. § 81-8,215; North Dakota, N.D. Cent. Code, § 32-12.2-02; Oklahoma, 51 Okl. St. § 153; Pennsylvania, 42 Pa.C.S. § 8522(b); Rhode Island, R.I. Gen. Laws § 9-31-1; South Carolina, S.C. Code Ann. § 15-78-40; Virginia, Va. Code Ann. § 8.01-195.3; Washington, Rev. Code Wash. (ARCW) § 4.92.090.

[38] *See e.g.*, Alaska: Alaska Stat. § 09.50.250 ; Colorado: C.R.S. § 24-10-108, et. seq.; or Maryland: Md. Code. Ann., StateGov't §12-101, *et. seq.*

related to legal process or jurisdictional immunity is not needed: in each of the examples cited, one with immunity from legal process who subsequently expressly assumes liability thrusts off that blanket of immunity, subject to any terms of the waiver itself as to jurisdictional, financial, temporal or procedural limitation.

### III. THE UN SECRETARY-GENERAL'S EXPRESS ACCEPTANCE OF LIABILITY IN REPORTS 51/389 AND 51/903 CONSTITUTED AN EXPRESS WAIVER OF IMMUNITY

Relying primarily on the Government's arguments, the District Court ruled that, although UN Reports 51/389 and 51/903 expressly assume liability for damages caused by its peacekeeping forces, "both reports contemplate that claims against the UN would be resolved by non-judicial means, including through UN-established standing claims commissions . . . ." SA-8. This is wrong for two reasons. *First*, such a conclusion is impossible as a matter of law, since the UN's internal claims processes do not bind the UN to anything. *Second*, the reports do not say anything close to what the District Court and the Government say they do.

As a threshold matter, it should be noted that UN Resolution 52/247, incorporating and adopting the findings and language of Reports 51/389 and 51/903, is binding upon the UN in the same manner that a statute is binding upon a state, or a treaty upon its signatories.[39] This is because the UN has "distinguish[ed]

---

[39] "The General Assembly occupies a central position as the chief deliberative, policymaking and representative organ of the United Nations." *See* http://www.un.org/ga/about/background.shtml. (last accessed Dec. 28, 2017).

between resolutions and decisions which are purely recommendatory in nature and resolutions and decisions which are binding on Member States."[40] Thus, there is no question that 51/389 and 51/903, which address "[a]dministrative and budgetary aspects of the financing of the United Nations peacekeeping operations," (A-369-402), and which were expressly adopted as legislative enactments by the UN General Assembly in UN Resolution 52/247, (A-404-407), are binding upon the Secretary-General and other UN officials charged with the administrative and financial operations of the Organization.

---

[40] *See* "Questions Relating To The Voting Procedure And Decisionmaking Process Of The General Assembly," 9 May 1986, as reported in *United Nations Juridical Yearbook, 1986, Part Two: Legal activities of the United Nations and related intergovernmental organizations*, page 275 ("Such legally binding resolutions or decisions include . . . *decisions relating to the budget of the Organization and other decisions relating to the internal administration and management of the Organization.* Once a legally binding resolution or decision of this type is validly adopted, it is binding on all Member States . . . (emphasis added).

a.  **The term "liability" cannot refer to the UN's internal claims processes, since these are non-binding and voluntary**

It is a central tenet of statutory construction that a legislative body doesn't use language that is meaningless. *See e.g., Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012); *Red Ash Coal Corp. v. Absher*, 153 Va. 332, 149 S.E. 541 (1929). Thus, the Secretary-General could not have intended to invoke the UN's non-binding, voluntary internal claims processes when he agreed that the Organization would be liable.  If there is no binding, there can be no liability. The words would be meaningless. It is impossible.

And the law will not recognize such impossible results. As the Supreme Court held: "*Lex non intendit aliquid impossible* is a familiar maxim of the law. The supposition should not be indulged that [a legislative body] . . . intended to make its protection depend upon the performance of conditions which it was physically impossible to perform." *Chew Heong v United States*, 112 US 536, 554-555 (1884). The only plausible conclusion is that the Secretary-General had an express waiver of immunity from legal process in mind in the limited circumstances of damages caused by its peacekeeping forces in the course of their official duties (but not, as we shall see, in cases of operational necessity or combat-related duties). There is no other explanation consistent with the UN's own use and understanding of the term liability. And, as discussed, *supra,* the Supreme Court has specifically found an express waiver of immunity where "we cannot imagine

34

any other plausible explanation for this unqualified language." *Pennsylvania v. Union Gas Co.,* 491 U.S. at 10.

Moreover, it is equally implausible to suggest that the Secretary-General had a different sense of the word liability, or that he simply didn't understand its meaning. Yet to affirm the District Court's decision, this Court must find that the Secretary-General misused the term liability throughout 51/389 and 51/903. That is, this Court must find that the Secretary-General did not understand the clear meaning of the word, including as referenced in numerous UN documents. Such a result also leads to speculation that the Secretary-General was improperly advised by UN lawyers, and that the General Assembly and its legal advisors were all unaware of the binding, obligatory nature of the term as well. Such a reading is not only implausible, it strains credulity. As the U.S. Supreme Court has noted, "[i]t is a cardinal rule of statutory construction that when a term is adopted, the [adopting body] "presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Molzof* v. *United States*, 502 U.S. 301, 307 (1992) (*quoting Morissette* v. *United States*, 342 U.S. 246, 263 (1952)).

### b. Reports 51/389 and 51/903 do not limit the UN's assumption of liability to its voluntary internal claims processes, or state that the UN has retained immunity

A close reading of Reports 51/389 and 51/903, and UN Resolution 52/247 reinforces this interpretation. Report A/51/389, for example states that it will detail three different things: (1) the scope of UN liability for activities of UN forces; (2) procedures for the handling of third-party claims presented internally and (3) limitations of liability. A-370. Nowhere does it suggest that the scope of UN liability as described in (1) is only in the context of, or otherwise constrained by, the internal procedure for handling third party claims review in (2), or that this scope of liability is only within the context of retained privileges and immunities. In fact, the report states the *opposite:*

> The undertaking to settle disputes of a private law nature submitted against it and the practice of actual settlement of such third-party claims – *although not necessarily according to the procedure provided for under the status-of-forces agreement* – evidence the recognition on the part of the United Nations that liability for damage caused by members of United Nations forces is attributable to the Organization [(emphasis added)]. A-372.

In addition, 51/389 distinguishes between "tortious liability of the Organization for damage caused in the ordinary operation of the force . . . and its liability for combat-related damage whether in the course of a Chapter VII operation, or in a peacekeeping operation where force has been used in self-defence." A-371. That is, the Secretary-General clearly states that the waiver does

36

not apply to the UN's combat-related actions, or to those grounded in operational necessity, but rather only to those damages resulting from the "ordinary operation of the force"—thus vastly limiting the parameters of the waiver.[41]

It is only in the second part of the report that the Secretary-General addresses an internal claims process at all: "The second part examines the existing procedures for settling third-party claims, the difficulties that have arisen in practice and new or modified mechanisms that will ensure simple, efficient and prompt settlement of third-party claims." A-371. Here again, there is no assertion that UN immunity in the CPIUN is preserved in those areas where liability is assumed, nor any mention that UN liability shall only be accessed through this internal claims process.

Section II of report 51/389 is entitled "Scope of United Nations liability for activities of United Nations forces," with a subsection describing the UN's "principle of Liability." In paragraph 6, the Secretary-General states that

---

[41] In ¶13-15, the Secretary-General states that, in order for an "operational necessity" provision to apply:

> the action must be strictly necessary and not a matter of mere convenience or expediency. It must also leave little or no time for the commander to pursue another, less destructive option . . . . [t]he act must be executed in pursuance of an operational plan and not the result of a rash individual action," and " . . . [t]he damage caused should be proportional to what is strictly necessary in order to achieve the operational goal."

No party has suggested that the UN's tortious introduction of cholera into Haiti would be considered "operational necessity."

damage caused in breach of an international obligation and which is attributable to the State (or to the Organization), entails the international responsibility of the State (or of the Organization) *and its liability in compensation*. [(emphasis added)]. A-372.[42]

Here, the UN distinguishes liability from "international responsibility." The UN recognizes that the legal definition of liability, as described in reports of the UN's International Law Commission and others, is something *greater* than mere responsibility—and that liability entails an agreement to be obligated and bound by laws.[43]

Notably, it is only in paragraph 7 of that 14-page document that there is single mention of immunity. There, the Secretary-General states that the UN "has undertaken in paragraph 51 of the model status-of-forces agreement (see A/45/594) to settle by means of a standing claims commission claims resulting from damage caused by members of the force in the performance of their official duties and which for reasons of immunity of the Organization and its Members could not have been submitted to local courts." A-372. The model status of forces agreement referenced in this paragraph was written and published in 1990, five years before the unambiguous assumption of liability in this document. Thus, the only mention of immunity is in the past tense and references a model status of forces agreement

---

[42] *See also* ¶ 8, where the Secretary-General describes—again, without referencing immunity—the UN's recognition "that liability for damage caused by members of United Nations forces is attributable to the Organization." A-372.

[43] See Point II of this brief for detailed discussion of the UN's acknowledgement of the different meanings of "responsibility" and "liability."

prepared long before the express acceptance of liability (and consequent waiver of immunity) in 51/389. It is therefore highly implausible to suggest, as the Government and District Court did, that this single mention of immunity was intended to cover the entire document, constraining the scope of UN liability to a non-binding claims process. Rather, this paragraph should be read as referring to the areas "in the performance of their official duties" that lie outside this express waiver of immunity—including "operational necessity," and "combat-related activities," which are not covered by 51/389, but instead by "international humanitarian law or the laws of war."[44]

In its final section, 51/389 lays out limits to the liability assumed in the UN's express waiver. As discussed in Point II of this brief, setting such limitations on a waiver of immunity, whether procedural, temporal or financial, are common practice when describing waivers of immunity to legal process through the assumption of liability. This section explains that while the UN *must* deal with claims by third parties where liability has been assumed, (A-373), contributing Governments will be legally responsible for indemnifying the UN in cases where damages are caused by the "gross negligence or willful misconduct" of their own peacekeeping forces. *Id.*, at 11. This provision, too, make *no* reference to either an

---

[44] See Section C, "Scope of liability for combat-related activities", in 51/389, ¶¶ 16-19, to which the express waiver of liability through assumption of liability does not apply.

internal claims settlement process or a retention of immunity in circumstances where liability is assumed.

In sum, it is highly implausible to suggest that the statements in that report relating to the UN's acceptance of liability were, in any way, *even remotely* confined to its voluntary internal claims process. Nor does the report anywhere suggest an intent on the part of the UN to maintain its privileges and immunities in those areas where the UN has agreed to be liable. There is simply no language to that effect. In fact, the UN's clear, unambiguous intent is that immunity is waived in these circumstances. To find otherwise would be to hold that a single, isolated reference to immunity contained in a paragraph relating to a Status of Forces agreement enacted years earlier somehow flows to every corner of this document—a provision that applies as readily to areas where liability is not assumed (such as for damages in the course of combat activities or operational necessity). The laws of contractual or statutory interpretation do not permit parties to conjure language missing from the clear text of a document. The document must be read as a whole.

In follow-up to 51/389, on May 21, 1997, the UN Secretary-General issued Report A/51/903, entitled "Administrative and budgetary aspects of the financing of the United Nations peacekeeping operations: financing of the United Nations peacekeeping operations", as a "supplemental" report. This report laid out further

temporal and financial limitations to the liability of the Organization, described the non-binding internal claims process in considerable detail, but specifically excluded from financial limits waiver claims "as a result of gross negligence or willful misconduct." A-378. The Secretary-General also stated in 51/903 that:

> [i]f such claims are established, the Organization would assume liability to compensate a third party, retaining the right to seek recovery from the individual or the troop-contributing State concerned. A-388.

Report 51/903 also recommended changes to the liability clause of the model status-of-forces agreement that would recognize this new, clearly and unambiguously stated acceptance of liability for damages caused by UN peacekeeping operations that were not the result of operational necessity: "A liability clause in the status-of-forces agreement would ensure that . . . the liability of the Organization would be binding . . . on the basis of its express consent." A-393. Then, 51/903 lays out the new language for this liability clause—the language in the SOFA signed between the government of Haiti and United Nations on July 9, 2004. A-178. As in 51/389, there is no mention that this express assumption of liability is only within the confines of the non-binding claims process. And as in 51/389, this single mention of UN immunity is in a paragraph discussing the prior version of the model SOFA, one that existed *before* the express assumption of liability was made in 51/389. This single reference to immunity, therefore, also should be read as relating only to those areas where liability was not assumed.

Both 51/389 and 51/903 were expressly incorporated, agreed to and adopted by the UN General Assembly through UN Resolution 52/247, dated June 26, 1998. A-404-407. In 52/247, the UN again expressly agreed to assume liability for "third-party claims against the Organization for personal injury, illness or death . . . resulting from or attributable to the activities members of peacekeeping operations in the performance of their official duties." A-388. There is no mention of the UN's immunity at all, and—as in each of the other documents that form the basis of this legislative enactment—no mention that such waiver of immunity is restricted to an internal claims process.

In the end, there is no plausible reading of 51/389 and 51/903 other than that the UN clearly and unambiguously assumed liability for the damages caused by its peacekeeping forces in circumstances such as in this case. As the Supreme Court has held, "[r]eliance on context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself.' " *King v Burwell*, __U.S.__, 135 S.Ct. 2480, 2495-2496 (2015), *citing Palmer* v. *Massachusetts*, 308 U. S. 79, 83 (1939). By misreading the UN's unambiguous assumption of liability so as to limit it to a non-binding internal claims process, and by imputing single references to "immunity" in 51/389 and 51/903 to every corner of those documents, the District Court improperly inferred

meaning from language that is not there, and legislated a retention of immunity where none exists.

## IV. THE DISTRICT COURT ERRED IN FINDING THE UN CANNOT EXPRESSLY WAIVE IMMUNITY IN ADVANCE, BUT INSTEAD ONLY SEPARATELY AFTER A CLAIM HAS BEEN FILED

In erroneously deciding that it lacked subject matter jurisdiction over this case, the District Court appears to have adopted the Government's argument that the UN cannot expressly waive immunity in advance for a class or group of cases, but instead must waive immunity in each individual case, and only after a claim has been filed ("[P]laintiffs fail to offer any plausible explanation for why these UN reports, which predate Haiti's cholera outbreak by more than a decade, constitute an express waiver of immunity in this 'particular case.'" SA-9. For the following reasons, the District Court erred in so holding.

### a. The District Court improperly made, rather than construed, treaty law by inferring that CPIUN § 2 prohibits the UN from expressly waiving immunity in advance

Nowhere in the CPIUN does it state that the UN's immunity cannot be waived in advance for a class or group of cases into which "any particular case" might fall. By adding a requirement that waiver can only be made in response to the individual filing of a specific claim, the District Court effectively added words to the CPIUN. It may not do so. As this Court reiterated in *Georges*:

"The interpretation of a treaty, like the interpretation of a statute,

43

begins with its text,"[45] and "[w]here the language of . . . [a] treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty."[46]

Neither the U.S. Government nor the District Court may amend § 2 to say what its drafters did not include. Rather, it is entirely within the UN's power under § 2 to accept liability and waive immunity in the event a particular type of case arises in the future, for a particular subclass or group of cases, or under particular circumstances, or to qualify UN immunity within certain limits for any of these cases that may arise. The CPIUN neither prohibits this nor makes it something other than an "express" waiver; indeed—and as discussed elsewhere in this brief— the law of immunity generally has no such requirement, and waiver in advance is commonplace.[47]

Moreover, once UN immunity is waived, it cannot be asserted later. This is the finding in *U.S. v. Bahel,* 662 F.3d 610 (2d Cir. 2011), where a UN official attempted to re-assert immunity after having waived in at trial. This attempted was rejected. Thus, in the present case, the UN's letter to the Government attempting to

---

[45] *Georges,* at 834 F.3d at 92, quoting *Abbott v. Abbott*, 560 U.S. 1, 10 (2010); *accord United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning.")

[46] *Id.,* citing Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 457 (2d Cir. 2003); Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134 (1989) ("We must . . . be governed by the text[,] . . . whatever conclusions might be drawn from the . . . drafting history . . . .").

[47] *See* Point II.

reassert its immunity in this case (A-145) has no legal validity. *See also Aquamar S.A. v. Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1287 n.18 (11th Cir. 1999).

At the very least, if this Court finds any ambiguity in the text, it should resolve such ambiguity in favor of advance waiver, since to rule otherwise leads to absurd consequences that the law should not allow.

### b. International legal authority recognizes that CPIUN § 2 allows for advance waiver

While some international legal scholars dispute the notion that a waiver under CPIUN § 2 can be effectuated in advance, this position is not supported by significant evidence. [48] Nor is there case law on this point, either under U.S. law or in other jurisdictions. The notion appears to have taken hold based on an earlier draft of § 2, which appended the language "for the purpose of any proceedings or by the terms of any contract" to the end of § 2—language which was then deleted from the final treaty[49] Professor August Reinisch, one of the leading commentators on United Nations immunity, has written that for some scholars:

> The deletion of this phrase in the final version of the Convention suggests that "it was not the intention of the Preparatory Commission or of the General Assembly, to extend the right of waiver in future . . . by the terms of

---

[48] The Restatement (Third), Foreign Relations §467, Reporter's Note 7, for example, states "[i]t is accepted that under Section 2 . . . the United Nations may waive immunity in a particular case, but may not waive its immunity in advance . . . ," but no case, drafting history or other support is offered for such a premise.

[49] Reinisch, August, *The Conventions on the Privileges and Immunities of the United Nations and its Specialized Agencies: A Commentary* (Oxford Commentaries on International Law), IV(A), Note 4.

a contract."[50]

Professor Reinisch adds, however, that "[g]iven that anticipated waivers of immunity are quite common and are often found in contracts, this limitation is rather unusual and has given rise to doubts as to its effectiveness.[51] Moreover, "there is now practice to suggest that [Section 2] waiver in advance, for example by means of a contractual provision submitting disputes arising thereunder to a national jurisdiction, will be given effect by a national court . . ."[52] Other academics have also acknowledged "disputes [that] exist in this context. For example, it is argued whether 'in any particular case' also entails waiver of immunity made in advance."[53]

Thus, the initial reaction of academics that the removal of the phrase "by the terms of any contract" from § 2 indicates intent to bar advance waiver was, in all probability, misplaced. More likely, such language was removed as *too limiting*, given that immunity can, in other circumstances, be waived by legislative enactment by the General Assembly, by the acceptance of liability insurance

---

[50] *Id*. at Note 98 (citation omitted.)

[51] *Id*.

[52] *Id*, note 228, *quoting* C Wickremasinghe, "International Organizations or Institutions, Immunities before National Courts," in *Max Planck Encyclopedia of Public International Law*, at 10, para 9.

[53] M. Möldner, "International Organizations or Institutions, Privileges and Immunities," in *Max Planck Encyclopedia of Public International Law*, para 38 (2011).

policy,[54] an agreement to arbitrate,[55] or—as in this case—through the express statements by the Secretary-General assuming liability.[56] Such language does not indicate an intent to bar advance waiver immunity, which is the norm in virtually every other context.

### c. The clear meaning of the words "any particular case" include a group or class of cases

Given the division in international legal scholarship, this Court should adhere to the plain meaning of the phrase "any particular case." The word "particular" is commonly defined as relating *not onl*y to a single thing, item, person or occurrence, but also to a group, class or subclass of things, items, persons or occurrences.[57] Further, the phrase in the CPIUN does not say "a" particular case or "each" particular case, but rather "any" particular case. And there is considerable authority holding that "any" is a purposefully broad and expansive term. *See e.g., United States* v. *Gonzales,* 520 U.S. 1, 5 (1997) ("Read

---

[54] *See, e.g.,* N.C. Gen. Stat. § 115C-42.

[55] "Under the law of the United States . . . an agreement to arbitrate is a waiver of immunity from jurisdiction in . . . an action to enforce an arbitral award rendered pursuant to the agreement . . . ." *Restatement (Third) of the Foreign Relations Law of the United States ß 456(2)(b)(ii)* (1987).

[56] It is accepted that the Secretary-General has the power to waive. See Reinisch, IV(A), ¶ 95.

[57] *See The American Heritage Dictionary, 5th Edition,* Dell Mass Market Edition, page 610 (Houghton, Mifflin, Harcourt Publishing Company, 2012) ("[b]elonging to or associated with a specific a specific person, group, thing or category."); *Webster's Third New International Dictionary of the English Language,* unabridged (Merriam-Webster, Incorporated, 1993) ("a separate part of the whole: a constituent element, section or division of something.").

naturally, the word 'any' has an expansive meaning . . . .").

It follows that the term "any particular case," unadorned with any other language or qualifier, should be read to include a group, section or division of things. To rule otherwise would, again, infer meaning from language that does not appear in the treaty.

### d.  To read the phrase "any particular case" in any other way would lead to absurd results

Two axiomatic principles underlie statutory interpretation. First, the law will not allow an interpretation that produces absurd results.[58] Second, when a term is ambiguous and a court can choose between two different interpretations, the court will not choose the one that produces an absurd result.[59]

So even if this Court should decline to hold that the UN, under CPIUN § 2, may clearly waive immunity in advance for a group of class of cases, it should, at the very least, find the phrase "any particular case" ambiguous with regard to whether it allows for advance waiver. And such ambiguity should be resolved in favor of the Plaintiffs, since it is axiomatic that "[i]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations . . . are

---

[58] *Sebelius* v. *Cloer*, 569 US 369, 381 (2013) ("[W]hen a statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms," unless "the disposition required by the text [would be] absurd.") (alteration and citation omitted).

[59] *See United States v. Kirby*, 74 U.S. 482 (1868); *People v. McRoberts*, 62 Ill. 38 (S.Ct. Illinois, 1871); *Fusz v. Spaunhorst*, 67 Mo. 256 (S.Ct. Missouri, 1878).

48

available." *See United States v. American Trucking Assns., Inc.,* 310 U. S. 534, 542-543 (1940); *Haggar Co. v. Helvering,* 308 U. S. 389, 394 (1940). Further, plain meaning is not conclusive in "rare cases" such as this, "in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982).[60]

Now consider the absurdity of the result that occurs if this reading of the "any particular case" language is allowed to stand. Under the District Court's reasoning, the Secretary-General of the United Nations could wake up every morning for a year—or ten years, for that matter—and issue an official statement waiving UN immunity for damages caused by the tortious acts of the Organization's peacekeeping forces. That official statement could then be adopted by the full General Assembly each afternoon. Yet, under the District Court's interpretation of the "any particular case," such statements of the Secretary-General *would be meaningless*. In the face of an actual claim, the UN could simply say, "No, sorry, despite our express statements to the contrary, there was no waiver of immunity in this case." Plaintiffs respectfully submit that it would be hard to find a set of circumstances so absurd.

Perhaps more troubling, under the District Court's reading, the UN could

---

[60] *See also United States v. Ron Pair Enterprises Inc.,* 489 U.S. 235, 242 (1982).

pick and choose when to waive immunity based on arbitrary and wholly unconscionable parameters, such whether they like or dislike the price tag of a particular claim; the political pressure or lack thereof surrounding a claim; the personalities involved; or the nationality, religion, gender or other characteristics of the parties. Haiti, as the Court well knows, is a poor, often marginalized country with little weight on the international stage. Should the UN be allowed to rescind its waiver of immunity in these cases simply because the devastation wrought did not occur in an *important* country, or to an *important* people, under the argument that the Organization had no ability to waive, despite express statements to the contrary? To add new language or meaning, or otherwise amend Section 2's "in any particular case" language, would allow for such an absurd result: "Where the plain language of the statute would lead to 'patently absurd consequences,'. . . we need not apply the language in such a fashion . . . where the result of applying the plain language would be, in a genuine sense, absurd." *Pub. Citizen v United States Dept. of Justice*, 491 US 440, 470 (1989), *quoting United States* v. *Brown*, 333 U.S. 18, 27 (1948).

### VII. THE DISTRICT COURT ERRED IN FINDING THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO IMMUNITY BECAUSE THE UN ITSELF IS NOT SO ENTITLED

The District Court also erred in holding that the individual defendants are immune from suit under the CPIUN, *see* SA-10. This is because the UN can only

confer such immunity on its officials that it has to give—and as described in this brief, the UN has expressly waived its immunity in the circumstances present in this case. *See* Linda S. Frey & Marsha L. Frey, *The History of Diplomatic Immunity,* 540 (Ohio State University Press, 1999) (explaining that "the privileges and immunities of officials stem directly from the immunity of the international organization"). Section 19 of the CPIUN provides that certain UN officers "shall be accorded . . . the privileges and immunities exemptions and facilities accorded to diplomatic envoys, in accordance with international law." A-479. That immunity, however, is entirely derivative of the immunity accorded to the UN. Section 20 of the CPIUN specifies that those "[p]rivileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves." A-358.

The immunity accorded to "diplomatic envoys" in general is similarly derivative, underscoring the derivate nature of CPIUN immunity. See *Vienna Convention on Diplomatic Relations* pmbl., Apr. 18, 1961, 23 U.S.T. 3227, 3230, 500 U.N.T.S. 95 ("[T]he purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions."); *United States v. Cty. of Arlington*, 669 F.2d 925, 930 (4th Cir. 1982) ("The privilege extended to an individual diplomat is merely incidental to the benefit conferred on the government he represents."); *see also*, Restatement

(Second) of Torts § 895D (2015) ("As a general rule, the immunity of a public officer is coterminous with that of his government.").  See also *Guevara v. Peru*, 468 F.3d 1289, 1305 (11th Cir. 2006) (finding that individual foreign official defendants "are not entitled to sovereign immunity because the sovereign itself is not"), *rev'd on other grounds*, 608 F.3d 1297 (11th Cir. 2010). There is simply no derivative immunity here for the individual Defendants to enjoy.

## VIII. THE MISTAKEN OPINION OF THE EXECUTIVE BRANCH IS NOT ENTITLED TO THE DEFERENCE THAT FEDERAL COURTS NORMALLY AFFORD SUCH OPINIONS

While courts may afford "great weight" to the Government's interpretation of a treaty, *Medellin v. Texas*, 552 U.S. 491, 513 (2008), this Court should not do so here because the Government's positions are unreasonable. This Court, not the Government, will determine whether the UN has expressly waived its immunity under CPIUN § 2. *See, e.g., Restatement (Third) of the Foreign Relations Law of the U.S.*, § 326, and *Shamsee v. Shamsee,* 74 A.D.2d 357, 360 (2d Dep't 1980) ("[T]he question of immunity from legal process under treaties and statutes of the United States lies within the province of the courts . . . . [C]laims of immunity must be resolved by the court on the basis of the facts properly before it."), and should not substitute the Government's mistaken interpretation of the scope of immunity for its own. *Sanders v. Szubin*, 828 F. Supp. 2d 542, 548 (E.D.N.Y. 2011) (district courts need not defer to the Executive Branch's disposition of

constitutional issues and instead must engage in their own *de novo* review). To the contrary, this Court should defer to the Government's interpretation only when it is reasonable. As this Court stated in *Ehrlich v. Am. Airlines, Inc.*: **"**[a]lthough we owe respect to the views of the Executive Branch in regard to the meaning of an international treaty, such deference is 'ordinarily due' only to the '*reasonable* views' of the government." 360 F.3d 366, 399 (2d Cir. 2004) (emphasis added). Similarly, in *Lozano v. Alvarez*, 697 F.3d 41, 54 (2d Cir. 2012), this Court held that deference to the Executive branch's unpersuasive interpretation of a treaty was unwarranted.

As explained above, the Government's position is unreasonable and unpersuasive. The Government argues incorrectly that the reference to "in any particular case" in CPIUN § 2 means that the UN must make an express statement waiving immunity individually and separately, at the time that each individual claim is brought before a Court. SA-7. The Government erroneously maintains in its SOI that clear acceptance of liability is merely a "a general commitment to provide for compensation for injury to innocent third parties . . ." A-141. Finally, the Government improperly "rejects" the Plaintiffs' "claim that the UN's potential acceptance of liability before a standing claims commission could ever amount to an *express* waiver by the UN of its immunity in a U.S. court." A-478. (emphasis in original)

In considering the weight to apply to the Government's position in this case, this Court should consider the full context of the government's "interpretation." The Government's position is entitled to no judicial deference.

## VII.  THE DISTRICT COURT IMPROPERLY DISMISSED THIS CASE WITHOUT ALLOWING PLAINTIFFS LIMITED DISCOVERY RELEVANT TO SUBJECT MATTER JURISDICTION.

Plaintiffs have presented a compelling case that as a matter of law, the UN expressly waived its immunity from legal process by assuming liability, according to the specific limitations in 51/389 and 51/903. If this Court believes more evidence is needed, however, to properly determine whether subject matter jurisdiction exists, it should remand so that Plaintiffs may conduct limited discovery on the UN as to this issue.  The District Court improperly denied this request. SA-12. As UN immunity is "a critical preliminary determination," the parties "must be afforded a fair opportunity to define issues of fact and law, and to submit evidence necessary to the resolution of the issues." *Foremost-McKesson, Inc.*, 905 F.2d 438, 449 (D.C. Cir. 1990).

This Court, of course, has discretion to order discovery as needed to make this "critical preliminary determination." *Id.* "The question of whether federal jurisdiction exists is not always free from doubt, and a federal court may have to examine and determine the facts and the law before concluding whether jurisdiction is appropriate. Thus, it follows that 'a court has jurisdiction to

determine its own jurisdiction." *Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 367 (2d Cir. 2005) (citations omitted). *See also In re United States Catholic Conference*, 824 F.2d 156, 162 (2d Cir. 1987) ("A lack of subject matter jurisdiction does not disable a district court from exercising all judicial power" as "even a court lacking subject matter jurisdiction may conduct appropriate proceedings to determine whether it has jurisdiction.").

Further, this Court has held that discovery may be ordered "to verify allegations of specific facts crucial to an immunity determination." *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998): In this regard, jurisdictional discovery is "appropriate where, as here, a plaintiff articulates a 'specific, well-founded allegation that an express waiver exists.'" *Polak v. Int'l Monetary Fund*, 657 F. Supp. 2d 116, 122 (D.D.C. 2009) (citation omitted); *see also Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) (looking to the "plausibility" of allegations in the context of a waiver of immunity under the FTCA).

In addition, such discovery would not unduly burden the UN. Such evidence is likely readily available because, in addition to the statements made by the Secretary-General in 51/389 and 51/903, in 2016 the UN apologized and accepted responsibility for the cholera outbreak. A-413. Reports published at that time indicate there was much internal discussion and debate at the UN over what words

could and could not be used when issuing such a statement. A-475. These discussions likely would have included considerations regarding what is meant when one accepts liability, and whether such assumption of liability is an express waiver of immunity. These discussions have occurred over the course of the past two years, and therefore are readily available and not reliant on historical record or distant memory.

The degree of immunity afforded the UN reflects its unique status and import on the global stage. But it does not follow that the UN should be completely insulated from legitimate inquiries into the possible bases of subject matter jurisdiction in this case. No other immune body is entitled to such protection; foreign sovereigns, as noted above, are not. The UN is not entitled to insulation from discovery unavailable to the very sovereigns that brought the UN into existence. If this Court finds that Plaintiffs have not yet sufficiently demonstrated that the UN has waived its immunity to subject matter jurisdiction, Plaintiffs are entitled to conduct the discovery necessary properly to determine this issue.

## CONCLUSION

The UN expressly waived immunity through the clear and unambiguous assumption of liability for damages caused by its peacekeeping forces in circumstances such as those present in this case. As a matter of law, such waiver was express, it was intentional and it could not have been made in reference to a

non-binding, voluntary UN claims process. The Government's arguments to the contrary in the District Court are implausible under any reasonable definition of word, and lead to absurd and unconscionable results. This Court should reverse the District Court's decision and allow this case to move forward. In the alternate, this case should be reversed and remanded to the District Court for a full determination of any facts that cannot be inferred in favor of the Plaintiffs, and a proper opportunity to be heard on these critical matters.

This Court should understand that, in seeking justice for the victims of the UN's cholera plague in Haiti, Plaintiffs are *not* asking this Court change the law in any way: not the law of *Brzak* or of *Georges,* not the law of liability, immunity or statutory construction. Plaintiffs ask only that this Court *apply* the law, for within the confines of existing law in these areas, justice for the people of Haiti lies.

## CERITFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,984 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/: James F. Haggerty

_____

JAMES F. HAGGERTY

December 29, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of December 2017, a true and correct copy of

the foregoing document was served via mail, to the following:

Miguel de Serpa Soares
United Nations
760 United Nations Plaza
New York, NY 10017

Edmond Mulet
429 East 52nd Street
Apartment 36A-E
New York, NY 10022

MINUSTAH Headquarters
Logistics Base
Boulevard Toussaint Louverture and
Clercine 18
Port-au-Prince, Haiti

Chandra Srivastava
c/o United Nations
760 United Nations Plaza
New York, NY 10017

Ban Ki-Moon
3 Sutton Place
New York, NY 10022

Paul Aghadjanian
c/o United Nations
760 United Nations Plaza
New York, NY 10017

Pedro Medrano
c/o United Nations
760 United Nations Plaza
New York, NY 10017

/s/: James F. Haggerty
_____
JAMES F. HAGGERTY

December 29, 2017

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

Memorandum and Order, dated August 23, 2017 ...... SPA-1

Judgment, dated August 24, 2017 ............................ SPA-12

SPA-1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
MARIE LAVENTURE, *et al.*,

                          Plaintiffs,                **MEMORANDUM & ORDER**

       - against -                    14-CV-1611 (SLT) (RLM)

UNITED NATIONS, *et al.*,

                         Defendants.
-------------------------------------------------------X

**TOWNES, United States District Judge,**

    Plaintiffs brought this putative class action against the United Nations ("UN"), the United

Nations Stabilization Mission in Haiti ("MINUSTAH"), and six current or former UN officials,

seeking redress for injuries and death that resulted from an outbreak of cholera in Haiti in 2010.

Defendants allegedly caused the outbreak by deploying cholera-infected UN peacekeeping

troops to Haiti.  Because defendants enjoy immunity from suit and because they have not waived

that immunity here, the Court dismisses this action for lack of subject-matter jurisdiction.

**I.**     **Background**

     **A.**     **Parties**

    Plaintiffs Marie, Maggie, Sane, and Carmen Laventure are citizens of the United States or

Haiti who reside in Queens, New York or Atlanta, Georgia.  Second Amended Complaint dated

June 23, 2017, Dkt. No. 20 ("2d Am. Compl."), ¶¶ 19–22.[1]  Plaintiffs' father (Cherylusse

Laventure) and stepmother (Marie Tthérèse Fleuriciane Delinais) died after contracting cholera

---

[1] The following facts are derived from the Second Amended Complaint and are assumed to be
true for purposes of this decision.

in Haiti during the fall of 2012. *Id.* ¶¶ 214–23. Plaintiffs purport to sue on behalf of themselves, the estates of their deceased parents, and all others similarly situated.

Defendant UN is an international organization founded in 1945 and headquartered in New York City. *Id.* ¶ 26. The UN's functions include "'maintain[ing] international peace and security'" and "'promot[ing] and encourage[ing] respect for human rights.'" *Id.* (first alteration in original). Defendant MINUSTAH, a "subsidiary organ of the UN" based in Port-au-Prince, was established in 2004 to "enhance stability . . . , promote democracy and rule of law, and support the Haitian government as well as Haitian human rights institutions and groups." *Id.* ¶¶ 27, 62. MINUSTAH's operations in Haiti are governed in part by a Status of Forces Agreement ("SOFA") which was executed between the UN and the Haitian government in July 2004. *Id.* ¶¶ 60, 64.

Defendant Ban Ki-moon was, at all relevant times, the Secretary-General of the UN. *Id.* ¶ 28. The other individual defendants, Edmond Mulet, Chandra Srivastava, Paul Aghadjanian, Pedro Medrano, and Miguel de Serpa Soares, held various positions at the UN that involved the organization's activities in Haiti during the relevant period. *Id.* ¶¶ 29–34.

**B.     Alleged Facts**

Between October 9 and 16, 2010, defendants UN and MINUSTAH deployed 1,075 Nepalese peacekeeping troops to Haiti. *Id.* ¶ 73. Before their deployment, these troops received three months of training near the Kathmandu Valley—an area of Nepal that had experienced a widely reported cholera outbreak. *Id.* ¶¶ 74–75. In Haiti, the troops were stationed at a base near water banks that connected to the Artibonite River, a primary source of water for tens of thousands of Haitians. *Id.* ¶ 11. Untreated human waste from the base seeped into the water

2

banks, which resulted in an outbreak of cholera along the Artibonite River and eventually throughout the country. *Id.* ¶¶ 11, 13.

Before the arrival of the Nepalese troops in October 2010, Haiti had no reported cases of cholera. *Id.* ¶ 8. Between October 2010 and May 2011, more than 4,500 Haitians died from the disease. *Id.* ¶ 163. The death toll has now surpassed 9,000. *Id.* ¶¶ 2, 42. Cherylusse Laventure and Marie Tthérèse Fleuriciane Delinais, the father and stepmother of the named plaintiffs, are among the victims. *Id.* ¶¶ 19–23.

Defendants UN and MINUSTAH failed to test the Nepalese troops for cholera before their deployment. *Id.* ¶ 78. In March 2012, authors of a peer-reviewed study concluded that all evidence "point[ed] to Nepalese UN peacekeepers as the initial source of cholera in Haiti." *Id.* ¶ 182. On December 1, 2016, defendant and then-Secretary-General Ban Ki-moon stated that, on behalf of the UN, he was "'profoundly sorry'" for the organization's role in Haiti's cholera epidemic and that it had a "'moral responsibility' to make things right." *Id.* ¶ 17.

### C.   Plaintiffs' Claims

Based on defendants' actions, plaintiffs assert claims of negligence, gross negligence, recklessness, wrongful death, negligent supervision, negligent and intentional inflection of emotional distress, nuisance, and breach of contract. *Id.* ¶¶ 228–89. As an alternative to damages, plaintiffs seek a declaratory judgment stating, among other things, that "the UN is required by law to establish a standing claims commission for Haiti, to process the Plaintiff class's third-party claims for property loss or damage and personal injury, illness or death arising from or directly attributed to MINUSTAH and its wrongful acts." *Id.* ¶ 298.

### D.    Procedural History

Plaintiffs commenced this action by filing a complaint on March 11, 2014.  Dkt. No. 1.

Magistrate Judge Mann later stayed the case pending the Second Circuit's decision in *Georges v.*

*United Nations*—an action that began in the Southern District of New York and involved similar

claims against the UN for Haiti's cholera epidemic.  Dkt. No. 8; *see Georges v. United Nations*,

84 F. Supp. 3d 246 (S.D.N.Y. 2015), *aff'd*, 834 F.3d 88 (2d Cir. 2016).  On August 18, 2016, the

Second Circuit affirmed the district court's decision to dismiss the case for lack of subject-matter

jurisdiction on the ground that the defendants were immune from suit.  *Georges*, 834 F.3d at 90.

In an order dated March 23, 2017 (Dkt. No. 13), Judge Mann directed plaintiffs to show

cause for why this case should not be dismissed in light of *Georges*.  In their written response,

plaintiffs attempted to distinguish this case on the ground that, unlike the plaintiffs in *Georges*,

they were arguing that defendants had "repeatedly and expressly" waived immunity otherwise

available to them.  Plaintiffs' Response to Order to Show Cause dated Mar. 30, 2017, Dkt. No.

14 ("Pl. OTC Response"), at 8; *see Georges*, 84 F. Supp. 3d at 249 ("Here, no party contends

that the UN has expressly waived its immunity.").  After expressing "serious doubts" about the

viability of plaintiffs' waiver theory, Judge Mann nevertheless invited the United States to

express its views pursuant to 28 U.S.C. § 517, and the Government did so in a statement of

interest dated May 24, 2017.  *See* Order dated Apr. 7, 2017, Dkt. No. 15; Government's

Statement of Interest dated May 24, 2017, Dkt. No. 17 ("Gov't Statement").[2]  Although none of

the named defendants have appeared in this action, the Government's statement included as an

exhibit a letter from the UN's Office of Legal Affairs to United States Ambassador to the UN

---

[2] 28 U.S.C. § 517 provides that the "Solicitor General, or any officer of the Department of
Justice, may be sent by the Attorney General to any State or district in the United States to attend
to the interests of the United States in a suit pending in a court of the United States."

Nikki Haley, in which the UN states that it has not waived, and indeed expressly maintains, its immunity and the immunity of its officials with respect to this case. *See* Letter dated May 2, 2017, Dkt. No. 17-1 ("UN Letter"), at 3.

After receiving leave from the Court to do so (Dkt. No. 19), on June 23, 2017, plaintiffs filed a memorandum of law responding to the Government's statement of interest along with a proposed Second Amended Complaint. *See* Memorandum of Law in Opposition to the Government's Statement of Interest dated June 23, 2017, Dkt. No. 21 ("Pl. Mem."); 2d Am. Compl., Dkt. No. 20. The Government replied to plaintiffs' memorandum in a statement of interest dated July 7, 2017. *See* Government's Statement of Interest dated July 7, 2017, Dkt. No. 22 ("Gov't Reply").[3]

## II.   Discussion

### A.   Legal Standards

#### 1.   Subject-Matter Jurisdiction

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also, e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008). Subject-matter jurisdiction is lacking when defendants are immune from suit. *See, e.g., Georges*, 834 F.3d at 98 (no subject-matter jurisdiction where UN, MINUSTAH, and UN officials had immunity). In resolving the question of subject-matter jurisdiction, courts "must take all facts alleged in the complaint as true and

---

[3] Although the Court had previously denied their request for a more extensive briefing schedule (Dkt. No. 19), plaintiffs later filed a letter-motion for leave to file a sur-reply and to allow for limited discovery. Letter-Motion dated July 11, 2017, Dkt. No. 24. While styled as a request to file a sur-reply, the letter-motion itself includes substantive arguments responding to the Government's July 7 submission. *Id.* The Court has considered the arguments raised therein, but nonetheless concludes that it lacks subject-matter over this case. Consequently, the Court denies as moot plaintiffs' motion for additional briefing and for discovery.

draw all reasonable inferences in favor of plaintiff." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (internal quotation marks omitted). The Court may consider documents outside the pleadings when making this inquiry. *See, e.g.*, *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*

### 2.    Treaty Interpretation

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008). "Where the language of . . . an international treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 457 (2d Cir. 2003). It is "settled that the United States' interpretation of a treaty is entitled to great weight." *Medellin*, 552 U.S. at 513 (internal quotation marks omitted); *see also Lozano v. Alvarez*, 697 F.3d 41, 50 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 134 S. Ct. 1224 (2014) ("[W]hile the interpretation of a treaty is a question of law for the courts, given the nature of the document and the unique relationships it implicates, the Executive Branch's interpretation of a treaty is entitled to great weight.") (internal quotation marks omitted).

### B.    Analysis

### 1.    Immunity of UN and MINUSTAH

The Charter of the UN, which was ratified and entered into force with respect to the United States in 1945, provides that the UN "shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes." U.N. Charter art. 105, ¶ 1; *Ahmed v. Hoque*, No. 01-CV-7224 (DLC), 2002 WL 1964806, at *3 n.3 (S.D.N.Y.

Aug. 23, 2002). The Convention on the Privileges and Immunities of the United Nations

("CPIUN"), which was adopted in 1946 and came into force with respect to the United States in

1970, specifies that the UN "shall enjoy immunity from every form of legal process except

insofar as in any particular case it has expressly waived its immunity." CPIUN art. II, § 2, 21

U.S.T. 1418; *Brzak v. United Nations*, 597 F.3d 107, 110–11 (2d Cir. 2010); *Georges*, 84 F.

Supp. 3d at 248.

 Thus, by its own terms, the CPIUN requires courts to recognize and to respect the UN's

"immunity from every form of legal process" unless "in any particular case" the UN "expressly"

waives its immunity. CPIUN art. II, § 2; *see also, e.g.*, *Boimah v. United Nations General*

*Assembly*, 664 F. Supp. 69, 71 (E.D.N.Y. 1987) ("Under [the CPIUN] the United Nations'

immunity is absolute, subject only to the organization's express waiver thereof in particular

cases."). "Express waiver [of immunity] requires a clear and unambiguous manifestation of the

intent to waive." *United States v. Chalmers*, No. 05-CR-59 (DC), 2007 WL 624063, at *2

(S.D.N.Y. Feb. 26, 2007).

 Here, in a letter addressed to Ambassador Nikki Haley, the UN states that it has "not

waived, and indeed, expressly maintains the privileges and immunities of the United Nations and

its officials in respect of this case." UN Letter at 3. Also, the letter requests that "competent

United States authorities . . . take appropriate action to ensure full respect for the privileges and

immunities of the United Nations and its officials." *Id.* at 2.

 Plaintiffs nevertheless argue that the UN has expressly waived its immunity for harm

caused by the Haitian cholera outbreak. Plaintiffs' argument rests primarily on two related

reports published by the Secretary-General in 1996 and 1997, both of which were adopted by the

UN General Assembly in 1998. Pl. Mem. at 9–14. These two reports—namely, Report

A/51/389 (published in 1996) and Report A/51/903 (published in 1997 as a supplement to Report

A/51/389)—outline the manner in which the UN would accept liability for damages caused by

UN peacekeeping operations, provided that such damages did not result from "operational

necessity." Report A/51/389 dated Sept. 20, 1996, Dkt. No. 21-2 ("Report 389"); Report

A/51/903 dated May 21, 1997, Dkt. No. 21-3 ("Report 903"). By agreeing to accept liability for

its activities, plaintiffs contend that the UN expressly waived its immunity for purposes of this

lawsuit. Pl. Mem. at 8–14; Pl. OTC Response at 8–9.

     As the Government notes, however, both reports contemplate that claims against the UN

would be resolved by non-judicial means, including through UN-established standing claims

commissions, given that domestic courts—because of the broad immunity available to the UN

and its officials—would not adjudicate such claims. *See* Gov't Reply at 2–3; Report 389 at 4 ¶ 7

(discussing settlement "by means of a standing claims commission claims . . . which for reasons

of immunity of the Organization and its Members could not have been submitted to local

courts"); Report 903 at 4 ¶ 7 (discussing "standing claims commission as a mechanism for the

settlement of disputes . . . over which the local courts have no jurisdiction because of the

immunity of the Organization or its members"). By agreeing to accept liability for its actions

through the channels outlined in these reports, there is no indication that the UN was waiving

immunity it enjoys in domestic courts.

     Plaintiffs complain that the UN failed to create a standing claims commission to address

injuries caused by the cholera outbreak, while contending that the SOFA between the UN and the

Haitian government required it to create one. 2d Am. Compl. ¶ 7, 60. The Second Circuit,

however, has concluded that the failure to create an adequate dispute-resolution mechanism does

not constitute an express waiver of immunity secured by the CPIUN. *See Brzak*, 597 F.3d at 112

8

("Although the plaintiffs argue that purported inadequacies with the United Nations' internal dispute resolution mechanism indicate a waiver of immunity, crediting this argument would read the word 'expressly' out of the CPIUN."); *see also Georges*, 84 F. Supp. 3d at 249 ("[C]onstruing the UN's failure to provide 'appropriate modes of settlement' for Plaintiffs' claims as subjecting the UN to Plaintiffs' suit would read the strict express waiver requirement out of the CPIUN.").

Finally, plaintiffs fail to offer any plausible explanation for why these UN reports, which predate Haiti's cholera outbreak by more than a decade, constitute an express waiver of immunity in this "particular case." CPIUN art. II, § 2. Even if the reports had indicated that the UN was generally willing to subject itself to lawsuits in certain circumstances, the reports would still not establish that the organization had waived its immunity here. For these reasons, the Court concludes, consistent with the Government's view, that the CPIUN immunizes the UN from this suit. *See Medellin*, 552 U.S. at 513 ("[T]he United States' interpretation of a treaty is entitled to great weight.") (internal quotation marks omitted).

As a UN subsidiary, MINUSTAH enjoys the same privileges and immunities as the UN under the CPIUN. *See Georges*, 84 F. Supp. 3d at 249 ("MINUSTAH, as a subsidiary body of the UN, is also immune from suit"); *Sadikoglu v. United Nations Dev. Programme*, No. 11-CV-294 (PKC), 2011 WL 4953994, at *3 (S.D.N.Y. Oct. 14, 2011) (noting that "scope of immunity for the UN and its subsidiary bodies derives" from the "UN Charter" and "CPIUN"). Consequently, the Court lacks subject-matter jurisdiction over plaintiffs' claims against both the UN and MINUSTAH.

SPA-10

### 2.   Immunity of Individual Defendants

The CPIUN provides that UN officials "shall . . . be immune from legal process in respect of . . . all acts performed by them in their official capacity," unless this immunity is waived by the Secretary-General or the Security Council.  CPIUN art. V, §§ 18, 20.  Thus, absent waiver, the CPIUN immunizes UN "officials sued for acts performed in their official capacities."  *D'Cruz v. Annan*, No. 05-CV-8918 (DC), 2005 WL 3527153, at *1 (S.D.N.Y. Dec. 22, 2005), *aff'd*, 223 F. App'x 42 (2d Cir. 2007) (internal quotation marks omitted).  UN officials also enjoy immunity for their official acts under the International Organizations Immunities Act ("IOIA"), Pub L. No. 79-291, 59 Stat. 669, 672 (1945) (codified at 22 U.S.C. § 288 *et seq.*).  Specifically, the IOIA provides that UN "officers and employees are 'immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as . . . officers . . . or employees except insofar as such immunity may be waived' by the United Nations."  *Id.* (quoting 22 U.S.C. § 288d(b)).

Here, plaintiffs have sued the individual defendants in their official capacities, and there is no indication that any relevant actions of the individual defendants fell outside the scope of their official duties.  Further, there is no indication that the UN, or any of its organs, waived the immunity available to the individual defendants.  To the contrary, the UN has expressly maintained their right to immunity.  UN Letter at 3.  For these reasons, the Court concludes, consistent with the Government's view, that the individual defendants are immune from suit under the CPIUN and IOIA.  Consequently, the Court lacks subject-matter jurisdiction over the claims against them.[4]

---

[4] In addition to immunity for their official acts, the Government contends that defendants Soares and Mulet have diplomatic immunity by virtue of their current positions at the UN.  In light of the above, however, the Court does not reach this issue or any other ground for dismissal raised

**III.    Conclusion**

For these reasons, this case is dismissed for lack of subject-matter jurisdiction.  Plaintiffs'

letter-motion to file a sur-reply and to open discovery (Dkt. No. 24) is denied as moot.  The

Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

s/SLT

SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
        August 23, 2017

by the Government.  *See Meintanas v. Hutomo*, No. 98-CV-2370 (LMM), 1999 WL 349628, at
*2 n.1 (S.D.N.Y. May 28, 1999).

11

SPA-12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
MARIE LAVENTURE, *et al.,*

                                        Plaintiffs,                              JUDGMENT
                                                                                 14-CV-1611(SLT)(RLM)
              - against –

UNITED NATIONS, *et al.,*

                                        Defendants.
----------------------------------------------------------- X

            A Memorandum and Order of Honorable Sandra L. Townes, United States
District Judge, having been filed on August 24, 2017, dismissing the action for lack of subject-
matter jurisdiction; denying Plaintiff's letter-motion to file a sur-reply and to open discovery
(Dkt. No. 24) as moot; and directing the Clerk of Court to enter judgment and close the case; it is


            ORDERED and ADJUDGED that the action is dismissed for lack of subject-
matter jurisdiction; that the Plaintiff's letter-motion to file a sur-reply and to open discovery
(Dkt. No. 24) is denied as moot; and that the case is closed.


Dated: Brooklyn, NY                                          Douglas C. Palmer
August 24, 2017                                              Clerk of Court


                                                 By:    */s/Jalitza Poveda*
                                                        Deputy Clerk